ATTORNEYS FOR APPELLANT
Susan K. Carpenter
Public Defender of Indiana

Thomas C. Hinesley
Deputy Public Defender

Kathleen Cleary
Deputy Public Defender

Laura L. Volk
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

James B. Martin
Deputy Attorney General

Stephen R. Creason
Deputy Attorney General
Indianapolis, Indiana



FILED

Mar 31 2009, 2:26 pm

CLERK
of the supreme court,
court of appeals and
tax court

### In the
### Indiana Supreme Court

No. 15S00-0512-PD-617

TOMMY PRUITT,

*Appellant (Petitioner below)*,

v.

STATE OF INDIANA,

*Appellee (Respondent below)*.

Appeal from the Dearborn Circuit Court, No. 15C01-0109-CF-054
The Honorable James D. Humphrey, Judge

On Direct Appeal From The Denial of Post-Conviction Relief

**March 31, 2009**

**Sullivan, Justice.**

Tommy Ray Pruitt was sentenced to death for the murder of a Morgan County police officer. His conviction and sentence were upheld on direct appeal. We now affirm the post-

conviction court's findings that Pruitt was not denied the effective assistance of trial or appellate counsel guaranteed by the Sixth Amendment, that he did not present it with newly discovered evidence that undermined confidence in his death sentence, and that his death sentence is not unconstitutional under the U.S. Supreme Court's decision in Atkins v. Virginia prohibiting sentencing persons with mental retardation to death.

**Background**

Our earlier opinion in this matter describes in detail the crimes of which Pruitt was convicted. See Pruitt v. State, 834 N.E.2d 90 (Ind. 2005). In brief, Pruitt shot Morgan County Sheriff's Deputy Daniel Starnes five times on June 14, 2001, ultimately resulting in his death on July 10, 2001. Before the shooting, Officer Starnes had stopped Pruitt for erratic driving, obtained his driver's license and registration, called the information in, and was told that a recent robbery report suggested Pruitt might be in possession of stolen weapons. As Officer Starnes approached Pruitt's car for a second time, Pruitt emerged with a handgun and the two exchanged gunfire. Pruitt was shot at least seven times and Starnes was struck by five shots.

The State sought the death penalty based on the fact that the victim was a law enforcement officer killed in the course of his duties. Pruitt sought to have the death penalty charge dismissed on the ground that he is an individual with mental retardation and therefore ineligible for the death penalty. The trial court denied the motion after conducting a full pre-trial hearing to determine mental retardation. A jury subsequently convicted Pruitt of murder, attempted murder, possession of a handgun without a license, resisting law enforcement, four counts of receiving stolen property, and the lesser-included offense of aggravated battery. It recommended the death sentence and the trial court sentenced Pruitt to death for the murder and to an aggregate term of 115 years for the remaining counts.

We affirmed Pruitt's conviction and sentence on direct appeal. Pruitt, 834 N.E.2d at 98. Pruitt petitioned for post-conviction relief and now appeals the denial of that petition.

2

**Discussion**

**I**

For the most part, completion of Indiana's direct appellate process closes the door to a criminal defendant's claims of error in conviction or sentencing. However, our law allows defendants whose appeals have been rejected to raise a narrow set of claims through a petition for post-conviction relief. See Ind. Post-Conviction Rule 1(1). The scope of the relief available is limited to "issues that were not known at the time of the original trial or that were not available on direct appeal." Allen v. State, 749 N.E.2d 1158, 1163 (Ind. 2001) (quoting Ben-Yisrayl v. State, 738 N.E.2d 253, 258 (Ind. 2000)). Issues available but not raised on direct appeal are waived, while issues litigated adversely to the defendant are res judicata. Id.; see also Williams v. State, 724 N.E.2d 1070, 1076 (Ind. 2000), cert. denied, 531 U.S. 1128 (2001).

A court that hears a post-conviction claim must make findings of fact and conclusions of law on all issues presented in the petition. See P–C.R. 1(6). The findings must be supported by facts and the conclusions must be supported by the law. Allen, 749 N.E.2d at 1164; see also Bivins v. State, 735 N.E.2d 1116, 1121 (Ind. 2000), reh'g denied. Our review on appeal is limited to these findings and conclusions.

Because the petitioner bears the burden of proof in the post-conviction court, see P–C.R. 1(5), an unsuccessful petitioner appeals from a negative judgment. A petitioner appealing from a negative judgment must show that the evidence as a whole "leads unerringly and unmistakably to a conclusion opposite to that reached by the trial court." Allen, 749 N.E.2d at 1164 (quoting Weatherford v. State, 619 N.E.2d 915, 917 (Ind. 1993), reh'g denied). This means that "[we] will disturb a post-conviction court's decision as being contrary to law only where the evidence is without conflict and leads to but one conclusion, and the post-conviction court has reached the opposite conclusion." Id. (quoting Miller v. State, 702 N.E.2d 1053, 1058 (Ind. 1998), cert. denied, 528 U.S. 1083 (2000)).

Pruitt contends that his conviction and death sentence must be vacated because his lawyers' performance at trial was so deficient that it denied him the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the Federal Constitution. To establish ineffective assistance of counsel, Pruitt must show that "(1) counsel's performance fell below an objective standard of reasonableness based on prevailing professional norms; and (2) 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome.'" Lambert v. State, 743 N.E.2d 719, 730 (Ind. 2001) (quoting Strickland v. Washington, 466 U.S. 668, 687, 694 (1984)).

As for the first component of an ineffective assistance claim – counsel's performance – we have noted that "[c]ounsel is afforded considerable discretion in choosing strategy and tactics, and we will accord that decision deference. A strong presumption arises that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Lambert, 743 N.E.2d at 730 (quoting State v. Holmes, 728 N.E.2d 164, 172 (Ind. 2000) (footnote omitted)).

As for the second prong, the U.S. Supreme Court has held that in most circumstances deficient performance of counsel will only be prejudicial when "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Rompilla v. Beard, 545 U.S. 374, 390 (2005) (quoting Strickland, 466 U.S. at 694). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Wiggins v. Smith, 539 U.S. 510, 534 (2003) (quoting Strickland, 466 U.S. at 694).

## II

Pruitt's first contention is that his trial counsel was ineffective for failing to investigate and present accurate evidence supporting his mental retardation claim. He claims that the omissions started before the pre-trial mental retardation hearing, continued during the hearing, and persisted throughout the trial.

**A**

We first evaluate his claims of alleged deficient performance before the pre-trial mental retardation hearing. Pruitt contends that (1) trial counsel failed to investigate and discover the fact that he was referred to special education classes in eighth grade; and (2) trial counsel failed to provide the court-appointed mental health expert with appropriate "informants" for assessing his adaptive functioning. (Br. of Pet.-Appellant at 39.) In his petition for post-conviction relief, Pruitt did not raise the claim that trial counsel failed to investigate and discover the fact that he was referred to special education in eighth grade. The post-conviction court (PC court) therefore did not discuss this claim in its order, and it is not available for this Court's review. See Allen, 749 N.E.2d at 1171 ("Issues not raised in the petition for post-conviction relief may not be raised for the first time on post-conviction appeal.") (citations omitted).

As for Pruitt's second claim, the PC court concluded that "trial counsel did not render ineffective assistance with respect to developing and presenting evidence of Petitioner's adaptive functioning." (App. to Br. of Pet.-Appellant 664.) Development and presentation of evidence regarding Pruitt's adaptive functioning is important because in order for him to qualify as an "individual with mental retardation," Indiana law mandates that he manifest both "significantly subaverage intellectual functioning" and "substantial impairment of adaptive behavior that is documented in a court ordered evaluative report." Ind. Code § 35-36-9-2 (Supp. 2007) (emphasis added).

The PC court made certain findings of fact from which it concluded that trial counsels' performance in this regard was not deficient. It found that trial counsel had presented the testimony of Nora Wesley, Pruitt's neighbor when he was growing up, and Mary Lambert, Pruitt's aunt, on the areas of work[1] and self-direction.[2] (App. to Br. of Pet.-Appellant 665.) Dr.

---

[1] Defense expert witness Dr. Hudson testified during that "work" refers to one's "ability to maintain employment . . . seek and get employment . . . independently." (Trial Tr. 1264.)

[2] Defense expert witness Dr. Hudson testified during trial that "self-direction" refers to one's "ability to take the initiative . . . to plan out somewhat their life's goal and then to pursue that independently." Id. at 1291.

5

Schmedlen, the court-appointed expert on mental retardation, had determined that Pruitt met the American Association on Mental Retardation (AAMR) criteria for having poor adaptive function because of the two areas identified in the questioning of Ms. Wesley and Ms. Lambert. Id. Defense witness Dr. Hudson also had determined that Pruitt was significantly deficient in six of the ten AAMR criteria for adaptive functioning based on his subjective assessment of the information he had before him. Id.

These findings of fact are corroborated by the trial transcript. Regarding the adaptive functioning criteria of self-direction, Nora Wesley testified on direct examination that Pruitt had always been a "follower" and "seemed like he had to struggle to get what he got out of school." (Trial Tr. 722.) She said that compared to other sixteen year olds at the time, Pruitt was deficient in the areas of math, reading, cooking, getting his clothes ready for the day, and doing laundry and that he was not ready to "be off on his own." Id. at 728-29. Pruitt had told her he wanted to be a fighter pilot, but Wesley testified that "I just don't feel Tommy was ready to get out and put hisself to the test of being, according to schooling and college." Id. at 730-31. Regarding the adaptive functioning criteria of work, Wesley testified that she didn't remember Pruitt having a job at that time. Id. at 731. On direct examination, Pruitt's aunt Mary Lambert corroborated Wesley's testimony on self-direction and work. She testified that Pruitt "would not do anything that you did not tell him to do"; in other words, he had to be "led by the hand." Id. at 1167-68. She had babysat him since age four, and testified that he "never intellectually grew up" and never moved on to have "families, relationships, hold jobs, those sorts of things." Id. at 1160. Lambert concluded that "Tommy had some severe mental limitations" and that "Tommy is 12 years old and will always be 10, 12 years old." Id. at 1172-73.

The court-appointed mental retardation expert, Dr. Schmedlen, then testified on direct examination that "based upon the information provided . . . by both Lambert and Ms. Wesley," he had determined that Pruitt "would meet the AAMR and the DSM-IV criteria for having poor adaptive functioning . . . because he had two or more areas in which he was substantially impaired." Id. at 643. Trial counsel also questioned defense expert Dr. Brian Hudson in detail

6

on the ten measures of adaptive functioning as defined by the AAMR.[3]  Dr. Hudson based his assessments of each measure on his training, his one-on-one meetings with Pruitt, and on review of Pruitt's history, all typical protocol for assessing adults.  Id. at 1269.  He found that Pruitt had substantial deficits in six measures of adaptive behavior: communication, home living,[4] work, functional academics,[5] social skills, and health and safety.[6]

Our review of the record does not lead us to an opposite conclusion than that reached by the PC court, that "Pruitt fails to present any evidence on post-conviction review showing that trial counsel unreasonably selected the mental health experts used at trial, or that, had trial counsel selected different experts (or respondents for assessing adaptive functioning), such would have led to a different conclusion by the trial court."  (App. to Br. of Pet.-Appellant 665.)

**B**

We next evaluate Pruitt's claims of alleged deficient performance by counsel at his pre-trial mental retardation hearing.  Pruitt makes the following contentions: (1) trial counsel failed to present complete evidence and testimony concerning his educational background, the limited services available to him, and his work history; (2) trial counsel failed to investigate and present research supporting his claim of mental retardation; (3) trial counsel failed to cross-examine effectively the State's experts; and (4) trial counsel failed to cross-examine effectively the State's witnesses with available impeachment.

---

[3] The AAMR, or American Association on Mental Retardation, defines ten measures of adaptive behavior: "communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work."  AAMR, Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed. 1992), quoted in Atkins, 536 U.S. at 308 n.3.  The AAMR defines mental retardation as "substantial limitations in present functioning . . . characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the . . . [above] applicable adaptive skill areas."  Id.

[4] Home living is defined as "one's ability to maintain an independent domicile, independent living situation."  (Trial Tr. 1259.)

[5] Functional academics is defined as one's "ability to use . . . academic content, the material you've learned in school, functionally in everyday life."  Id. at 1279.

[6] Health and safety is defined as one's "ability to independently maintain the bare minimal, the essentials of a healthy life-style."  Id. at 1293.

7

The PC court concluded that "[t]rial counsel did not render ineffective assistance of counsel in their investigation, development, preparation, and presentation of evidence at the mental retardation hearing." (App. to Br. of Pet.-Appellant 682.)

**B-1**

Pruitt's first contention is that "[c]ounsel's failure to provide testimony to explain the school records and the quality of the educational services provided to Pruitt, and what a mentally retarded persons is capable of doing in a supportive and occupational setting, was prejudicial to Pruitt . . . [because] Pruitt's case focused on whether he was mentally retarded, and his witnesses should have been part of a cohesive presentation on that issue." (Br. of Pet.-Appellant at 43.) The PC court concluded that trial counsels' performance was not deficient in this respect and that "no evidence of Pruitt's educational background presented at post-conviction . . . would have had, if it had been offered at trial, any effect on his convictions and sentences." (App. to Br. of Pet.-Appellant 679.)

The PC court made certain findings of fact from which it reached its conclusion. Regarding Pruitt's educational background and the limited services available to him, the PC court found (1) that trial counsel had presented the fact that in elementary school, Pruitt was retained for two grades, and he was in special education in 1971 and 1972; (2) that trial counsel also had presented testimony from Pruitt's junior high teacher Rex Nichols that Pruitt did not seem interested in school and that with full effort he was a C student; and (3) that Randy Tutterow, Pruitt's fifth and sixth grade social studies teacher, had testified that he thought Pruitt was a C and D student, and that his lack of interest had a negative effect on his grades. Id. at 669.

There is evidence in the record to support the PC court's findings of fact. Defense counsel, in his direct examination of Dr. Hudson, presented multiple facts from Pruitt's educational background, including

8

he never got beyond . . . 8th grade of school . . . he never obtained a GED, that for better than one year, in a very small elementary school in the '70s, was placed in a special education program, evidence that he had substantial problems in simple mathematics and reading, grades one through three . . . was retained twice before the eighth grade, that on two occasions were socially promoted . . . in fact, been retained four years in the first eight grades of school, absent social promotion, would have been 16 and a half before . . . 7th grade.

(Trial Tr. 1282-83.)

Dr. Hudson also testified that his conclusions about whether Pruitt was an individual with mental retardation were based on "educational records of Mr. Pruitt's throughout grade school . . . [and] his grades for all the years that he was in school." Id. at 1209. Our review of the PC court's findings does not lead us to an opposite conclusion than that reached by the PC court. We affirm the PC court's conclusion that trial counsels' performance was not deficient in this regard. (App. to Br. of Pet.-Appellant 679.)

Regarding Pruitt's work history, the PC court found that "Pruitt has had a number of jobs throughout his life." Id. at 669. It went on to list jobs that both the State and defense counsel had presented at the mental retardation hearing and noted the competency with which Pruitt performed these jobs.

Pruitt contends that trial counsel was deficient in presentation of his work history because counsel did not explain "how such a history was possible for a person who has substantial intellectual deficits." (Br. of Pet.-Appellant at 42.) But in point of fact, trial counsel did explain how Pruitt's work history was possible for a person with substantial intellectual deficits. In his cross-examination of State's witness, Dr. Schmedlen, trial counsel asked, "And now, is it a fair characterization . . . that actually having a job is not necessarily indicative of adaptive behavior?" (Trial Tr. 690.) Dr. Schemedlen replied in the affirmative. Trial counsel also explored the fact that Pruitt was able to earn a commercial driver's license. He asked Dr. Hudson on direct, "So merely acquiring a CDL, would that tell you anything about a person's mental retardation or lack thereof?" Id. at 1262. Dr. Hudson replied, "No, no, no, no." Id. Trial counsel delved further into this topic by asking Dr. Hudson, "Is merely being employed enough to satisfy the, I guess lack of a deficit in the work adaptive behavior?" Id. at 1264. Dr. Hudson responded in the

9

negative, and defense counsel asked him to elaborate. Finally, trial counsel presented the following evidence explaining Pruitt's work history:

> defendant had been able to acquire his journeyman's carpenter card without the skills appropriate for that level, that he was able to maintain the job with Pete Carlino only because he was the son of Mr. Carlino's trusted employee, and could only work as an assistant to his father, that he was unable to work with any of the other numerous employees of Mr. Carlino because he lacked the requisite skills, that he was unable to grasp simple tasks in carpentry that would be expected of at least a lower level carpenter, much less a journeyman carpenter, that he was unable to retain skills when taught them, that there was no evidence to suggest he was able to adjust to tasks given him, that, in fact, he was fired by Mr. Carlino shortly after his father left his employment because he was costing too much money for the skills for which he was being paid.

Id. at 1265-66. Dr. Hudson concluded that based on the above evidence, "Mr. Pruitt [would] show a deficit in the work adaptive behavior." Id. at 1266.

As the foregoing indicates, the record is replete with examples of trial counsel exploring how Pruitt's work history was possible for a person with substantial intellectual deficits. Our review of the trial record does not lead us to an opposite conclusion than that reached by the PC court, that petitioner was not the victim of ineffective assistance of counsel in this regard.

**B-2**

We address Pruitt's second and third contentions of deficient performance at his pre-trial mental retardation hearing together because they are related and the PC court treated them together. His second contention is that trial counsel failed to investigate and present research supporting his mental retardation: specifically, the impact of a so-called "Flynn Effect"[7] on his "WAIS-III"[8] full-scale IQ score of 76. The PC court concluded that "Pruitt establishes neither

---

[7] The Flynn Effect was first identified by Professor James Flynn in 1984 and refers to the gradual escalation of intelligence test scores over long periods of time. (See PCR Tr. at 41.)

[8] The WAIS-III stands for the Wechsler Adult Intelligence Scale, Third Edition and is the most current edition of the Wechsler series of IQ tests. (See PCR Tr. 28; see also Trial Tr. 659.) The U.S. Supreme Court has cited it as "the standard instrument in the United States for assessing intellectual functioning." Atkins, 536 U.S. at 309 n.5, citing Mental Retardation, supra n.3.

deficient performance nor prejudice with respect to this claim." (App. to Br. of Pet.-Appellant 680.)

Pruitt's third contention is that trial counsel failed to cross-examine effectively Drs. Schmedlen and Groff, who disagreed with Pruitt's experts. (See Br. of Pet.-Appellant at 45.) Specifically, Pruitt contends that trial counsel (1) failed to challenge Dr. Schmedlen's allegedly erroneous reliance on Pruitt's "Otis-Lennon Test"[9] score; (2) failed to present to Dr. Schmedlen the impact of the Flynn Effect before the doctor's assessment of Pruitt's mental retardation; and (3) failed to cross-examine Dr. Groff regarding his obligations under the Ethical Principle of Psychologists and the Code of Conduct and Specialty Guidelines for Forensic Psychologists. See id. at 46.

The PC court only addressed Pruitt's second contention that trial counsel should have cross-examined Dr. Schmedlen with regard to the impact of the Flynn Effect on Pruitt's WAIS-III IQ score. It concluded that "Pruitt has failed to establish deficient performance or prejudice with regard to this claim." (App. to Br. of Pet.-Appellant at 675.) It added, "[t]his is all the clearer in hindsight, considering the Indiana Supreme Court's opinion on direct appeal observing that, '. . . IQ tests are only evidence; they are not conclusive on either the subject's IQ or the ultimate question of mental retardation.'" Id., quoting Pruitt, 834 N.E.2d at 106.

The PC court made certain findings of fact from which it reached its conclusion. It found that "[p]etitioner presented testimony through experts regarding a phenomenon, regarded with some contention among practitioners, of test scores gradually and incrementally generating higher scores over the life of the test . . . referred to as the Flynn Effect." Id. at 674. "Pruitt's own witnesses conceded that there was disagreement in the psychological community regarding acceptance of this theory, and that literature suggests a reversal in the Flynn Effect in developing western nations." Id. at 674-75. "Regardless, trial counsel presented five different IQ test scores obtained over a span of approximately 30 years that ranged from a full scale IQ of 52 to a full

---

[9] The Otis-Lennon School Ability Test is a group-administered academic achievement test. IQ tests differ from academic achievement tests in that they are individually administered and gauge true intellectual ability, whereas academic achievement tests generally gauge how well an individual has learned school materials. See Pruitt, 834 N.E.2d at 104; Trial Tr. 659-60; PCR Tr. 27-28.

scale IQ of 76." Id. at 675. In addition, "Pruitt's examination of Dr. Schmedlen at a deposition, Petitioner's Exhibit 41, about these matters was fruitless." Id.

There was evidence to support the PC court's findings of fact. During the pre-trial mental retardation hearing, defense counsel cross-examined State expert Dr. Schmedlen regarding Pruitt's WAIS-III IQ score of 76 and the impact of the Flynn Effect on this score. Dr. Schmedlen indicated that the WAIS-III has a "standard error of measure" of five points, meaning that Pruitt scored in the range of 71 to 81. (Trial Tr. 617-18.) He concluded from this analysis that Pruitt was not an individual with mental retardation. Id. at 618-19. Later in the cross-examination, defense counsel asked, "Assuming that the result of Dr. Olvera's WAIS-III is artificially high such that the real score is within two standard deviations of 70, would that affect your opinion as to Mr. Pruitt's intellectual functioning?" Id. at 678. Dr. Schmedlen responded, "I think it might, yeah." Id. at 679. Defense counsel did not ask any further questions about the Flynn Effect.

Our review of the PC court's findings does not lead us to a conclusion opposite the conclusion reached by the PC court. We find that trial counsel's performance was not deficient in his presentation of evidence regarding the impact of the Flynn Effect on Pruitt's WAIS-III IQ score. This is especially true given Dr. Schmedlen's deposition before the PCR hearing, when he testified, "I don't know whether the Flynn Effect on a test that's only four or five years old, whether that's sort of swallowed up by the standard error of measurement or whether it's separate and apart . . . I'm not sure there's a standard in the field yet." (Pet.-Appellant Ex. #41 at 24-25 in Pet.-Appellant Vol. of Ex. IV.)

**B-3**

Pruitt next contends that trial counsel's performance was deficient for failing to impeach the testimony of witnesses Rex Nichols and Randy Tutterow with available information about his educational background. He further contends that this failure prejudiced Pruitt because the "court and the jury were left with the false impression that his educational failures were the result of a lack of interest." (Br. of Pet.-Appellant at 48.) The PC court concluded that Pruitt "fails his

burden on these allegations of ineffective assistance of trial counsel." (App. to Br. of Pet.-Appellant 677.)

The PC court found that "Pruitt presented no evidence relating to potential impeachment of State's witnesses Randy Tutterow or Rex Nichols and therefore fails to prove deficient performance of trial counsel." Id. The PC court also found that "even if Pruitt had made a showing that these witnesses could have been discredited, it could not meet the prejudice prong of Strickland." Id.

There was evidence in the record to support the PC court's findings. Pruitt contends that Nichols's testimony at trial that his junior high school had not yet developed a special education program at the time of his attendance "was demonstrably false" and that "special education was called resource class." (Br. of Pet-Appellant at 47.) He contends that "Nichols could have been cross-examined on this issue had counsel known" [that special education was called resource class]. Id. Our review of the record shows that Pruitt attended "Resource Class" for Math, English and Spelling during the 1978-79 school year and that "Resource Class" was the term used for special education in his school system at that time. (Aff. of Mary Mann, App. to Br. of Pet.-Appellant 865.) The record also shows that Nichols did incorrectly testify that a special education program "was not yet developed" at Pruitt's school during the 1978-79 school year and that trial counsel did not cross-examine Nichols on his mistake. (Trial Tr. 1035.) Assuming arguendo that counsel's failure to cross-examine Nichols constituted deficient performance, his omission still did not prejudice Pruitt. Besides the 1978-79 school year, the trial record contains evidence that "Mr. Pruitt was [also] in special education from 1971 to 1972." (Aff. of Mary Mann, App. to Br. of Pet.-Appellant 864.) At trial, counsel had presented this evidence and extensive testimony regarding Pruitt's subaverage educational history and the special educational services provided to him through the testimony of Dr. Hudson, Nichols, and Randy Tutterow. See supra, Part II-B-1. This was more than sufficient to offset counsel's failure to cross-examine Nichols on one fact in Pruitt's educational history.

Second, Pruitt contends that trial counsel should have impeached State's witness Randy Tutterow with information that he was returned to "resource classes" in eighth grade. During

post-conviction proceedings, Pruitt's own witness, Mary Jo Dare, admitted that placement in "resource classes" could have been for reasons other than academic inability. (See PCR Tr. 333.) Post-conviction counsel presented evidence that trial counsel was not aware of Pruitt's return to "resource classes" in eighth grade. See id. at 170-71. Trial counsel acknowledged that Randy Tutterow's testimony during the mental retardation hearing that Pruitt was not in special education classes after third grade "simply wouldn't be true." Id. at 203-04. This is inconsistent with the PC court's finding that "Pruitt presented no evidence relating to potential impeachment of . . . Randy Tutterow." (App. to Br. of Pet.-Appellant 677.) But, as discussed in the preceding paragraph, there was more than enough evidence on Pruitt's educational history to offset the failure to impeach Tutterow with information that Pruitt was returned to "resource classes" in eighth grade.

Our review of the PC court's findings, when combined with the additional evidence in the trial record on Pruitt's educational history, does not lead us to a conclusion opposite the conclusion reached by the PC court. We find that trial counsel's performance was not deficient when he did not impeach witnesses Nichols and Tutterow.

**C**

Pruitt makes two ancillary contentions of trial counsel ineffectiveness in presenting evidence related to his mental retardation claim. He claims that at the penalty phase of trial, trial counsel were deficient because (1) they informed the jury that the State would have experts testifying that Pruitt was not mentally retarded, when the State did not in fact present any expert testimony on this point; and (2) they failed to impeach State's witness Randy Tutterow with evidence that Officer Starnes had helped Tutterow's son when the young man was a volunteer with the Sheriff's Department.

Pruitt did not advance the first claim in his petition for post-conviction relief and the PC court did not make any findings related to the claim. It is therefore not available for our review. See Allen, 749 N.E.2d at 1171 ("Issues not raised in the petition for post-conviction relief may not be raised for the first time on post-conviction appeal.") (citations omitted). As for his second

14

claim, the PC court concluded that "Pruitt failed to establish deficient performance or prejudice with respect to his claim that trial counsel failed to expose this witness' bias." (App. to Br. of Pet.-Appellant 663.)

There was evidence in the record to support the PC court's findings of fact. At the mental retardation hearing, trial counsel elicited from Tutterow that Officer Starnes had helped his son when he was a volunteer at the Sheriff's Department. (See Trial Tr. 1761.) However, he asked no further questions on this topic. During the penalty phase of trial, defense counsel cross-examined Tutterow but did not ask any questions related to his possible bias. See id. at 5890-92. Like the PC court, we do not find this to constitute evidence of bias that should have been pursued.

Our review of the PC court's findings does not lead us to a conclusion opposite the conclusion reached by the PC court. We conclude that trial counsel's performance was not deficient in his cross-examination of State's witness Randy Tutterow.

**III**

Pruitt's next contention is that trial counsel was ineffective for failing "to secure appropriate mental health experts to fully evaluate the extent of [his] mental disabilities," (Br. of Pet.-Appellant at 34), and for failing to "effectively use the mental health experts retained." (Br. of Pet.-Appellant at 31.) In other words, he claims that (1) trial counsel did not select fully-qualified mental health experts and (2) trial counsel did not take the necessary steps to ensure that his experts fully evaluated Pruitt's alleged mental retardation and mental illness. He cites the testimony of experts from the PCR hearing regarding Pruitt's alleged mental retardation and mental illness to support his claims.

The PC court concluded that "Pruitt's post-conviction evidence is substantially cumulative of the testimony and opinion presented at trial. Moreover, the Court does not find the

15

expert testimony offered at post-conviction more credible or more deserving of weight than the testimony offered on mental health issues at trial." (App. to Br. of Pet.-Appellant 665-66.)

## A

The PC court made findings of fact from which it reached its conclusion. It first summarized the "evidence related to mental health issues presented at trial." See id. at 666-71. As for the intellectual functioning prong of mental retardation,[10] the court found that defense expert Dr. Olvera had administered the "Wechsler scale" (i.e., the WAIS-III) to Pruitt in April 2002, and that Pruitt scored a full scale IQ of 76. The Wechsler scale has a standard error of measurement of five points so Pruitt scored within the range 71 to 81. Id. at 667, citing Trial Tr. 617-18. Dr. Olvera had testified that this score "was too high to show significantly subaverage intellectual functioning." Id. at 672. The court also found that defense expert Dr. Golden had administered the "Stanford-Binet IQ test"[11] to Pruitt in February 2003 and that he scored a full-scale IQ of 65. Id. at 667, citing Trial Tr. 622, 1504, 1595-1602, 1646. He had opined during trial that Pruitt's IQ fell within the range of mental retardation. Id. at 668, citing Trial Tr. 1553-54. As for the adaptive functioning prong of mental retardation,[12] the court found that defense expert Dr. Hudson had determined that Pruitt was significantly deficient in six of the ten areas of adaptive functioning based on his subjective assessment of the information he had before him. Id. at 669, citing Trial Tr. at 1256-97.

---

[10] Indiana Code § 35-36-9-2 defines an "individual with mental retardation" as "an individual who, before becoming twenty-two (22) years of age, manifests: (1) significantly subaverage intellectual functioning; and (2) substantial impairment of adaptive behavior; that is documented in a court ordered evaluative report." (emphasis added).

[11] Dr. Olvera testified that the Stanford-Binet IQ test, along with the WAIS, are considered the "gold standard" among IQ tests. (PCR Tr. at 28.) Dr. Hudson also testified that the Stanford-Binet test is "reliable, well accepted." (Trial Tr. at 659.)

[12] Indiana Code § 35-36-9-2 defines an "individual with mental retardation" as "an individual who, before becoming twenty-two (22) years of age, manifests: (1) significantly subaverage intellectual functioning; and (2) substantial impairment of adaptive behavior; that is documented in a court ordered evaluative report." (emphasis added).

16

The PC court then summarized the evidence that trial counsel presented regarding mental illness. It found that trial counsel had presented a diagnosis from an Indiana Department of Correction (DOC) psychologist who diagnosed Pruitt as suffering from "schizophrenia, chronic undifferentiated residual uncompensated." Id. at 671, citing Def. Trial Ex. BO. It also found that defense expert Dr. Golden had "explained that this diagnosis means the psychologist believed at one time Pruitt was schizophrenic but that at the time of diagnosis he was not actively schizophrenic."[13] Id., citing Trial Tr. 6054. Dr. Golden had "concluded that a diagnosis of schizophrenia was inappropriate for Pruitt, and that he actually suffered from either schizoid or schizotypal personality disorder."[14] Id., citing Trial Tr. 6057.

The PC court went on to summarize "evidence related to mental health issues presented at post-conviction." See id. at 671-74. It started with evidence of mental retardation. As for the intellectual functioning prong of mental retardation, the court found that petitioner's expert Dr. Denis Keyes had administered the "Stanford-Binet 5"[15] to Pruitt and he scored a full-scale IQ of between 61 and 69. Based upon this data, Dr. Keyes had determined that Pruitt was an individual with mental retardation. See id. at 672, citing PCR Tr. 117-18. As for the adaptive functioning prong of mental retardation, the court found that Dr. Keyes had tested Pruitt using the "ABAS II."[16] He had selected Pruitt, Pruitt's father, mother, and two sisters as respondents

---

[13] "Schizophrenia is a disturbance that lasts for at least 6 months and includes at least 1 month of active-phase symptoms (i.e. two [or more] of the following: delusions, hallucinations, disorganized speech, grossly disorganized or catatonic behavior, negative symptoms) . . . The characteristic symptoms of Schizophrenia involve a range of cognitive and emotional dysfunctions that include perception, inferential thinking, language and communication, behavioral monitoring, affect, fluency and productivity of thought and speech, hedonic capacity, volition and drive, and attention." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) 273-74 (4th ed. 1994).

[14] Defense expert witness Dr. Golden testified at trial that schizotypal personality disorder is an "Axis 2 mental illness, a personality, characterological disorder" that is specifically cited in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders. (Trial Tr. 6043-44.) He also testified that this disorder can evolve into a more serious and dangerous Axis 1 mental illness such as paranoid schizophrenia. Id. at 6045.

[15] This is the most current edition of the Stanford-Binet IQ test. (See PCR Tr. at 28) (Dr. Olvera testified that "[f]or the Stanford-Binet the most current edition is the fifth.").

[16] The ABAS II stands for the Adaptive Behavior Assessment System, Second Edition. "The Adaptive Behavior Assessment System (ABAS) (Harrison & Oakland, 2000) is a new adaptive behavior measure developed by using the 1992 AAMR [American Association of Mental Retardation] 10 adaptive skill domains as the a priori domains of adaptive behavior . . . the 10 skill domains from the 1992 definition [of

to the ABAS II.[17] Id. The court also found that Dr. Keyes had administered the "Independent Living Scales"[18] and the "Scale of Independent Behavior"[19] to assess Pruitt's adaptive functioning. Id.

The PC court found that Pruitt also had presented the following expert testimony regarding his mental retardation at the PCR hearing. Dr. Phillip Coons had testified that Pruitt was an individual with mental retardation and that his diagnosis had been "based on the work of other professionals and his interviews with Pruitt and Pruitt's relatives." Id. at 673. "Dr. Coons performed no tests to guard against malingering." Id. Dr. David Price had diagnosed Pruitt with mild mental retardation, and "rendered his diagnosis . . . in total reliance upon data generated by other professionals." Id. at 674. Pruitt also had presented Dr. Stephen Golding in order to discredit the testimonies of State's experts Drs. Schmedlen and Groff, who had testified at Pruitt's pre-trial mental retardation hearing. "Dr. Golding generally testified that Drs. Schmedlen and Groff failed to adequately validate the sources of their information in rendering opinions. Dr. Golding testified that Dr. Groff's methodology violated ethical guidelines that are grounds for his dismissal from the organization." Id. at 672. However, Dr. Golding "did not personally evaluate Pruitt" and "performed no tests upon him." Id.

---

proper adaptive functioning] address the conceptual, practical, and social skill areas in the current definition. Although the ABAS does not provide broader domain scores that are consistent with the three skill areas in the 2002 definition, the use of a total score on the ABAS would be appropriate for diagnostic purposes." American Association on Mental Retardation, Mental Retardation: Definition, Classification, and Systems of Support 90 (10th ed. 2002).

[17] The ABAS "has two adult forms, including a self-report and a report by others." Id.

[18] "The Independent Living Scale (ILS) is a comprehensive tool for assessing activities of daily living, behavior and initiation skills following traumatic brain injury." Center for Neuro Skills TBI Resource Guide, http://www.neuroskills.com/cns/ilsmenu.shtml (last visited March 31, 2009). The Center for Neuro Skills is a rehabilitation service provided for persons with acquired brain injury.

[19] "The Scales of Independent Behavior-Revised (SIB-R) (Bruininks et al. 1991) is a component of the Woodcock-Johnson Psycho-Educational Battery . . . The SIB-R provides a wide array of scores for diagnosis and planning supports. For diagnosis, scores on Social Interaction and Community Skills, Personal Living Skills, and Community Living Scales are consistent with the social, practical, and conceptual domains in the current definition [of proper adaptive functioning]." Mental Retardation, supra n.16 at 89. Dr. Keyes also testified that the Scale of Independent Behavior was a "Corroborative Self-Report." (PCR Tr. 116.)

The PC court then found that Pruitt had presented the following evidence regarding his mental illness at the PCR hearing. Dr. Coons had testified that Pruitt had paranoid schizophrenia, but he "performed no tests to guard against malingering." Id. at 673. In addition, "Dr. [James] Ballenger concluded that Pruitt suffered from paranoid schizophrenia based solely upon information obtained directly from Pruitt . . . or from Pruitt's family members," each time "explaining to Pruitt . . . that the examination was at the request of his post-conviction lawyers, and that it could have an impact on his post-conviction proceedings." Id. Dr. Ballenger had not employed tests for malingering. Id. Finally, Dr. Price had testified that "Pruitt suffers from schizophrenia, and also diagnosed a 'cognitive disorder not otherwise specified' on Axis I."[20] Id. He had also rendered "Axis II diagnoses of premorbid schizotypal personality disorder."[21] Id. Dr. Price had "met with Pruitt on two occasions and met with his parents and his sister. He also had reviewed reports rendered by the other experts obtained for post-conviction, school records, and prison records." Id. Like Drs. Coons and Ballenger, he also had "performed no specific measures to ensure against malingering." Id. at 673-74.

The PC court then made the following conclusion: "Based on the evidence from trial and from post-conviction as summarized above, the Court concludes that trial counsel were not ineffective in selecting experts and preparing mental health evidence for use in the penalty phase or sentencing." Id. at 674. More specifically, the PC court concluded that "[t]rial counsel obtained qualified mental health experts who competently advanced a diagnosis of mental retardation, albeit an ultimately unsuccessful strategy." Id. It also concluded that "trial counsel presented evidence of a schizotypal personality disorder, a diagnosis different more in degree of severity than of character, than the one advanced by experts Petitioner was able to present over three years later in post-conviction proceedings" [i.e., a diagnosis of paranoid schizophrenia]. Id.

---

[20] Defense expert witness Dr. Golden testified that mental illness is divided into two categories, Axis 1 and Axis 2. "Axis 1 are the more serious problems, schizophrenia, major depression, major anxiety disorders, people who might be suicidal . . . Axis 2 . . . are not considered as serious and the people are not considered dangerous." (Trial Tr. 6040.)

[21] Dr. Price testified that "[v]ery often people that develop schizophrenia have a premorbid and actually coexisting schizotypal personality disorder. They're odd, they're eccentric, they have magical thought, have a little bit of paranoia, have unusual beliefs, their seeing is different from other people, tend to be somewhat isolated from others. And those individuals tend to go on to develop schizophrenia." (PCR Tr. 705.)

19

The court concluded that the different diagnosis "does not show that trial counsel were deficient." Id.

## B

There is evidence in the record to support the PC court's findings of fact and conclusions of law. Trial counsel presented extensive expert testimony supporting Pruitt's claim of mental retardation at the pre-trial mental retardation hearing and at trial. Petitioner's post-conviction counsel's presentation of additional expert testimony on this issue during the PCR hearing was largely cumulative of that presented at trial.

Our review of the record shows that both trial counsel and post-conviction counsel presented expert testimony on both prongs of Indiana's statutory definition for an "individual with mental retardation," I.C. § 35-36-9-2, the intellectual functioning prong and the adaptive functioning prong. We proceed to enumerate our findings.

## B-1(a)

As for the intellectual functioning prong, defense expert Dr. Dennis Olvera administered the WAIS-III IQ test to Pruitt before trial. Dr. Olvera did not testify during trial, but both sides elicited testimony about Pruitt's WAIS-III test results from court-appointed mental retardation expert Dr. George Schmedlen. Dr. Schmedlen testified on direct examination that Pruitt's IQ score of 76 is in the "borderline range" of intellectual functioning for an individual with mental retardation but concluded that the score was "above the generally accepted standard for what would be classified as significantly subaverage intellectual functioning." (Trial Tr. 617-19.) Trial counsel probed this conclusion on cross examination, asking Dr. Schmedlen whether his opinion would be affected "[a]ssuming that the result of Dr. Olvera's WAIS is artificially high such that the real score is within two standard deviations of 70 [the threshold score for classification as mental retarded]?" Id. at 678. Dr. Schmedlen conceded that it might affect his conclusion. See id. at 679.

Trial counsel then questioned defense expert Dr. Golden on Pruitt's WAIS-III results. Dr. Golden testified that his review of Pruitt's Department of Correction records showed that Pruitt was on the antipsychotic medication Trilafon at the time that he took Dr. Olvera's WAIS-III IQ test. Id. at 1501. He testified that if "given the appropriate antipsychotic drug," the IQ scores of those with psychiatric disorders "may go up significantly because of improvements in attention and focusing." Id. at 1500. Dr. Golden then administered the Stanford-Binet IQ test to Pruitt while he was not on any antipsychotic medication. Id. at 1501-02. Pruitt scored an overall IQ of 65, from which Dr. Golden concluded that Pruitt was mentally retarded. Id. at 1504, 1507. Dr. Golden reinforced his conclusion by testifying that after considering "the totality of the IQ tests . . . and the academic achievement tests . . . and all of the rest of the materials," his opinion was that Pruitt's IQ falls "in the range of mental retardation." Id. at 1553-54.

Our review of the record shows that the following evidence regarding the intellectual functioning prong of mental retardation was presented at the PCR hearing. Like Dr. Golden, State's expert witness Dr. Denis Keyes testified that he administered the Stanford-Binet IQ test to Pruitt and Pruitt scored "somewhere between 61 and 69 as a full scale." (PCR Tr. 117.) This score "put him within the range of mental retardation." Id. Petitioner's expert witness Dr. Olvera testified that Pruitt scored a full scale IQ of 76 on the WAIS-III test he administered, which was the "first administration of an appropriate intelligence test" on Pruitt. Id. at 30, 33, 46. This IQ score was significantly higher than Pruitt's scores on other multi-factorial IQ tests.[22] When asked what explained this outlier, Dr. Olvera opined that the "only difference" was that Pruitt was taking the antipsychotic medication Trilafon when tested by Olvera, and he stopped taking it during subsequent IQ test administrations. Id. at 48. He explained that a number of recent scientific studies have indicated that the use of antipsychotic medication can improve cognition in schizophrenics, id. at 39, allowing them to attain the level of intellectual functioning

---

[22] Dr. Olvera testified that "[i]n forensic testing practitioners are cautioned that the analysis of IQ is to be performed with the multifactorial measure." (PCR Tr. at 27.) Multi-factorial IQ tests include the WAIS and the Stanford-Binet. See id. at 28. They do not include academic achievement tests such as the Revised-Beta, the Otis-Lennon, and the Lorge-Thorndike, other tests that were administered to Pruitt throughout his life. See id. at 29.

they are capable of if they did not suffer from schizophrenia.[23]  Id. at 51-52.  Even though he advised trial counsel that in his professional opinion, Pruitt did not meet the intellectual functioning prong of mental retardation, id. at 50, Dr. Olvera testified that his conclusion had changed after reading the other experts' reports.  He agreed with Dr. Keyes that Pruitt was mentally retarded.  Id. at 44-45.

Also during the PCR hearing, petitioner's expert Dr. Coons, a psychiatrist, diagnosed Pruitt with mild mental retardation even though he acknowledged that he did not consider himself an expert in the field.  Id. at 453-54.  Dr. Coons also did not do any IQ testing on his own, but relied entirely on the testing of other experts to come to his conclusion.  Id. at 453-54, 472.  He performed no tests to identify malingering.  Id. at 476.  Petitioner's expert Dr. Price also diagnosed Pruitt with mild mental retardation.  Id. at 704.  Like Dr. Coons, he based his conclusion on other experts' testing results, and review of Pruitt's educational records.  Id. at 736-37.  He also did not administer any tests to identify malingering.  Id. at 707.

## B-1(b)

As for the adaptive functioning prong of Pruitt's mental retardation diagnosis, trial counsel questioned defense expert Dr. Brian Hudson in detail on ten measures of adaptive functioning as defined by the AAMR.[24]  Dr. Hudson based his assessments of each measure on his training, his one-on-one meetings with Pruitt, and on review of Pruitt's history, all typical protocol for assessing adults.  (Trial Tr. 1269.)  He found that Pruitt had substantial deficits in the six adaptive behaviors of communication, home living,[25] work,[26] functional academics,[27]

---

[23] He did acknowledge that "[t]he literature at that time [when he first administered the WAIS-III before Pruitt's trial] indicated that the effect of those drugs on cognition was either neutral, or in some cases even slightly deleterious."  Id. at 39.

[24] See supra n.3.

[25] See supra n.4.

[26] See supra n.1.

[27] See supra n.5.

social skills, and health and safety.[28]  Based on these findings, Dr. Hudson concluded that Pruitt met "the commonly accepted definitions . . . for the second prong of the mental retardation definition," which requires "two or more deficits" as defined by the AAMR.  Id. at 1297-98. State's witness Dr. Schmedlen corroborated this conclusion based on information he obtained through interviews of Pruitt's aunt Mary Lambert and Pruitt's neighbor Nora Wesley.  Id. at 643.

At the PCR hearing, State's expert Dr. Keyes testified that he tested Pruitt's adaptive functioning using the Independent Living Scales test, a "Corroborative Self-Report on Mr. Pruitt called the Scale of Independent Behavior," and the Adaptive Behavior Assessment Scale (ABAS-II). (PCR Tr. 116.)  His methodology included interviewing Pruitt's father, mother, and sisters Francine and Jennifer with questions from the ABAS-II, id., interviewing and getting to know Pruitt himself, and reviewing Pruitt's records, id. at 108-09.  He assessed Pruitt on "independent living skills," which included cleanliness, work skills (i.e., how well one can maintain a job), and functioning socially in society; and on "communication skills."  Id. at 108. He did guard against malingering but did not find any.  Id. at 95-96.  Based on his evaluations, Dr. Keyes concluded that Pruitt has been an individual with mental retardation "since he was . . . probably an infant."  Id. at 117.  Petitioner's expert Dr. Coons also assessed Pruitt's adaptive functioning based on "Pruitt's history, the history from his parents and his sister that I got, and the collateral history from other informants, plus the school records."  Id. at 473.  Dr. Coons opined that in order to meet the criteria for mental retardation, "you have to have trouble in . . . two of 10 or 11 areas of what we call adaptive functioning."  Id. at 454.  He concluded that "in my taking of the history and doing collateral interviews, I felt he had difficulties in at least eight of those areas."  Id.  He took Pruitt's relatives' self-reports during the interviews at face value because they corroborated evidence from other informants and were consistent with Pruitt's IQ scores and school records.  Id. at 474-75.  Dr. Coons did not administer any tests for malingering. Id. at 476-77.

Our review of the record on trial counsel's performance in presentation of evidence regarding mental retardation does not lead us to a conclusion opposite the conclusion reached by

---

[28] See supra n.6.

23

the PC court. We agree with the PC court that "trial counsel were not ineffective in selecting experts and preparing mental health evidence for use in the penalty phase or sentencing." (App. to Br. of Pet.-Appellant 674.) More specifically, we affirm the PC court's conclusion that "[t]rial counsel obtained qualified mental health experts who competently advanced a diagnosis of mental retardation, albeit an ultimately unsuccessful strategy." Id.

**B-2**

There is also evidence in the record that supports the PC court's conclusion that trial counsel was not deficient in its presentation of evidence regarding Pruitt's mental illness. During the pre-trial mental retardation hearing, defense expert Dr. Hudson testified on direct that Federal Bureau of Prisons (BOP) records provided to him before trial indicated that psychologists at the Indiana DOC had diagnosed Pruitt with "undifferentiated schizophrenia."[29] (Trial Tr. 1213.) During his assessment of Pruitt, Dr. Hudson noticed that he was "potentially psychotic" and that he started to respond to questions with "off-the-wall kind of comments, comments that weren't clearly lucid." Id. at 1215. Dr. Hudson also testified to reading Pruitt's self-reports to State's witness Dr. Schmedlen, where Pruitt indicated he was "experiencing tactile hallucinations, the feeling of fire. He'd also reported visual hallucinations, as well as auditory hallucinations." Id. at 1225.

During trial, defense expert Dr. Golden testified on direct examination that the Psychological Services Unit of the Federal BOP had diagnosed Pruitt as having a "schizotypal personality disorder . . . an Axis 2 mental illness"[30] in 1996 while he was imprisoned for another offense. Id. at 6043. He explained that "psychotic episodes should be the exception rather than the rule" for those with this disorder, and that if these episodes "were the main symptoms, then you would be diagnosing him as schizophrenic or something similar to that." Id. at 6045-46. Later in the trial, Dr. Golden testified on direct examination that about two months after Pruitt

---

[29] "The essential feature of the Undifferentiated Type of Schizophrenia is the presence of symptoms that meet Criterion A of Schizophrenia [i.e., the characteristic symptoms] but that do not meet criteria for the Paranoid, Disorganized, or Catatonic Type." DSM-IV, supra n.13 at 289.

[30] See supra, n.20, 21.

was arrested for allegedly killing Officer Starnes, an Indiana DOC psychologist diagnosed Pruitt as suffering from "schizophrenia, chronic undifferentiated type compensated residual." Id. at 6053. Dr. Golden explained that this diagnosis means that the psychologist "thinks that at one time that he [Pruitt] was actually schizophrenic . . . but that right now most of those serious symptoms are not showing and . . . he's somewhere now in between a personality disorder and the Axis 1 schizophrenia." Id. at 6054. In other words, "[h]e's not suggesting he's actively schizophrenic, but he is expressing his belief that he is capable of easily becoming schizophrenic at some time in the future." Id. at 6055. Dr. Golden concluded that Pruitt's mental illness is "in the schizophrenia spectrum of disorders"; however, his opinion is that the illness is "not severe enough to be called schizophrenic, so I go with the schizotypal or the schizoid diagnosis." Id. at 6057. Dr. Golden then explained in detail the symptoms of schizoid personality disorder and its debilitating effects on the patient. See id. at 6058-62.

At the PCR hearing, petitioner's expert Dr. Coons testified that Pruitt had Axis I schizophrenia.[31] (PCR Tr. 450.) However, Dr. Coons also opined that "before he got schizophrenia he has a . . . diagnosis of schizotypal personality disorder . . . all of the symptoms with schizotypal personality disorder are included under schizophrenia." Id. at 458. Dr. Coons based his diagnosis on a three-hour evaluation of Pruitt, interviews with family members, the reports written by other petitioner's experts obtained for post-conviction, and review of Pruitt's social history. Id. at 446-49. He performed no tests to detect malingering. Id. at 476-77. Dr. Price diagnosed Pruitt with paranoid schizophrenia, id. at 707, and schizotypal personality disorder, id. at 705. Petitioner's counsel asked, "Doesn't that mean that Dr. Golden was right?" Dr. Price replied, "Very often . . . Very often people that develop schizophrenia have a premorbid and actually coexisting schizotypal personality disorder." Id. at 705. Dr. Price based his diagnoses on six hours with Pruitt, interviews with his family and his direct appeal counsel, review of his records, and review of other experts' reports. Id. at 699, 729. He also performed no tests to detect malingering. Id. at 707.

---

[31] See supra n.20.

Like Drs. Coons and Price, Dr. Ballenger also diagnosed Pruitt with schizophrenia. Id. at 552. He testified that the Federal BOP's 1996 diagnosis of schizotypal personality disorder "is either the first two, three steps of schizophrenia, or is actually the beginning of schizophrenia. Schizotypal personality is just quarter-strength schizophrenia." Id. at 587-88. He proceeded to affirm both Dr. Hudson's and Dr. Golden's trial testimony regarding Pruitt's mental illness. He testified that "he [Dr. Hudson] did notice bizarre schizotypal kind of behavior" and that "Hudson, Golden, and the three of us, all of us see the same thing, even though . . . that [the schizotypal behavior] was not their primary focus." Id. at 589-90. He also opined that Dr. Golden's diagnosis, "a decompensated psychotic state of somebody with a schizotypal personality . . . is only a hair different from what I would have said." Id. at 589. He concluded that "Dr. Golden saw the same thing that I did, Dr. Coons, Dr. Price. He saw really the same thing, he just slightly used a different terminology, but he said there was psychosis." Id. Dr. Ballenger based his diagnosis on information from Pruitt's family members (who knew that he was retained by Pruitt's post-conviction counsel), two brief meetings with Pruitt himself, reports of other experts retained by petitioner for the post-conviction hearing, and "some references in the prison records." Id. at 549-50, 606-09, 613, 618-19. He found letters Pruitt wrote to his family "absolutely critical" to his diagnosis, id. at 579, but he was not sure if they had been written before or after Pruitt shot Officer Starnes, id. at 609-10. Dr. Ballenger also did not perform any tests to detect malingering, even though he testified that they were "relatively effective." Id. at 614.

Our review of the record does not lead us to a conclusion opposite the conclusion reached by the PC court on trial counsel's performance in presenting evidence regarding Pruitt's mental illness. We agree with the PC court that "trial counsel presented evidence of a schizotypal personality disorder, a diagnosis different more in degree of severity than of character, than the one advanced by experts Petitioner was able to present over three years later in post-conviction proceedings" [i.e., a diagnosis of paranoid schizophrenia]. (App. to Br. of Pet.-Appellant 674.) We also agree with the PC court's conclusion that a different diagnosis "does not show that trial counsel were deficient." Id.

Finally, we agree with the PC court that "[b]ased on the evidence from trial and from post-conviction as summarized above . . . trial counsel were not ineffective in selecting experts and preparing mental health evidence for use in the penalty phase or sentencing." Id.

**IV**

Pruitt's next contention is that trial counsel was ineffective for not pursuing a "Guilty but Mentally Ill" (GBMI) defense at the guilt phase (Phase I) of trial, even though "[t]here is no dispute that Pruitt suffers from serious mental illness."[32] (Br. of Pet.-Appellant at 37.) The verdict of GBMI is "an alternative verdict, an intermediate ground, which embodies the circumstance long recognized in the law – the defendant who suffers from a mental illness or deficiency yet remains capable of appreciating right from wrong and conforming his conduct to the requirements of the law." Gambill v. State, 675 N.E.2d 668, 677 (Ind. 1996), reh'g denied (quoting Taylor v. State, 440 N.E.2d 1109, 1112 (Ind. 1982)). "[A] defendant found GBMI is to be sentenced 'in the same manner as a defendant found guilty of the offense.'" Weeks, 697 N.E.2d 28, 30 (Ind. 1998) (quoting I.C. § 35-36-2-5(a) (Supp. 1994)).[33] "Nonetheless, in sentencing a GBMI defendant 'in the same manner' as any other guilty defendant, trial courts should at a minimum carefully consider on the record what mitigating weight, if any, to accord to any evidence of mental illness." Weeks, 697 N.E.2d at 30. We observed in Prowell v. State that no current death sentences in Indiana have been imposed, and no executions have been carried out, following jury verdicts of GBMI. 741 N.E.2d 704, 717-18 n.8 (Ind. 2001).

Pruitt argues that even if a GBMI conviction does not preclude a death sentence, Strickland dictates that "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case" in order to show ineffective assistance. (Br. of Pet.-

---

[32] "'Mentally ill' means having a psychiatric disorder which substantially disturbs a person's thinking, feeling, or behavior and impairs the person's ability to function; 'mentally ill' also includes having any mental retardation." I.C. § 35-36-1-1.

[33] I.C. § 35-36-2-5(a) (Supp. 2007) states: "Except as provided by subsection (e) [i.e., a defendant charged with murder and found to be mentally retarded], whenever a defendant is found guilty but mentally ill . . . the court shall sentence the defendant in the same manner as a defendant found guilty of the offense."

Appellant at 38, citing id., 466 U.S. at 693.) Instead, Pruitt contends that he "must show only a reasonable probability of a different result, which 'is a probability sufficient to undermine confidence in the outcome.'" Id., citing Strickland, 466 U.S. at 694. He concludes that there is "at least a reasonable probability that if trial counsel had presented accurate and complete evidence of Pruitt's mental retardation and other mental disabilities of which they were aware, Pruitt would have received a sentence less than death." Id. at 39. We pause to emphasize this point. Pruitt's argument is not so much that it constituted ineffective assistance of counsel for trial counsel not to have pursued a GBMI verdict as it was for trial counsel not to have presented the quantum of mental illness evidence necessary to mitigate a death sentence.

During post-conviction proceedings, trial counsel was asked whether he had considered pursuing a GBMI defense. He responded in the negative, and then proceeded to discuss his mitigation strategy. He stated that his first priority was to prove that Pruitt was mentally retarded because this factor would have "great mitigating weight." (PCR Tr. 214-15.) His second priority was to prove that "Pruitt was suffering from a serious mental illness at or around the time of the crime" by presenting Indiana DOC records, Federal BOP records, Pruitt's bizarre behavior before the crime, and the facts and circumstances surrounding the crime. Id. at 215. This Court has held that "[t]here is a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. Counsel is afforded considerable discretion in choosing strategy and tactics, and these decisions are entitled to deferential review." Stephenson v. State, 864 N.E.2d 1022, 1031 (Ind. 2007) (citations omitted). Here trial counsel made a deliberate strategic decision to concentrate the jury's attention on Pruitt's claim of mental retardation. We agree that this strategy might well have been undermined by greater emphasis on the much weaker mental illness evidence.

The PC court concluded that "the facts here do not support a likelihood that an attempt to secure a guilty but mentally ill verdict would have been successful, much less cause a different sentence." (App. to Br. of Pet.-Appellant 677.) It viewed petitioner's claim as "simply a re-phrasing of Pruitt's claims that trial counsel were ineffective for their presentation of mitigation evidence, regarding which this Court finds Pruitt has failed to establish either deficient performance or prejudice." Id. at 675. The PC court was "not persuaded . . . that the experts

28

offered at trial had been injudiciously chosen or lacking in qualification, nor does Petitioner show that the trial experts used suspect methodology or obtained unreliable results from their examinations and assessments." Id. at 677.

During both the pre-trial mental retardation hearing and during trial, trial counsel presented extensive mitigation evidence through expert testimony that Pruitt was "mentally ill" (as defined by I.C. § 35-36-1-1) at the time of the crime. See supra Part III-B. We agree with Pruitt that trial counsel did focus his questioning and presentation of evidence more on the mitigating factor of mental retardation, which, as noted above, we believe was appropriate given its strength relative to that of mental illness. However, trial counsel also presented ample evidence of Pruitt's mental illness through the expert testimony of Drs. Hudson and Golden. See supra Part III-B-2. The defense experts' trial testimony was reviewed and later corroborated by petitioner's experts' testimony at the PCR hearing. See supra Part III-B. Our review of the record does not lead us to a conclusion opposite the conclusion reached by the PC court. We find that trial counsels' performance in presenting mitigation evidence was not deficient for not pursuing a GBMI defense during the guilt phase of trial.

## V

Pruitt also contends that trial counsels' performance was deficient for failing to prepare a comprehensive, written "narrative social history" that thoroughly explained his background. (Br. of Pet.-Appellant at 51.) He argues that this omission prevented his experts from conducting an accurate evaluation of his mental health. Id. at 54-56. In turn, "[c]ounsel's failure to provide their experts with an informative social history left the jury with a mental health diagnosis that did not capture the extent of Pruitt's mental illnesses." Id. at 54-55. Pruitt contends that trial counsel's deficient performance in this respect prejudiced him at trial because "[a] comprehensive description of the poverty and abuse" Pruitt experienced had the capacity to produce a different sentence. Id. at 54.

29

The PC court concluded that "Pruitt fails to show that trial counsel were ineffective for failing to have a social history compiled as a trial document." (App. to Br. of Pet.-Appellant 663.) The court found that "this record supports the conclusion that trial counsel thoroughly investigated Pruitt's background, including family, social, educational, penal, and medical histories." Id. In addition, the court found "no evidence that Pruitt's experts at trial believed that they had insufficient or inaccurate information." Id. at 684. In point of fact, "[c]ounsel conducted a thorough investigation into Pruitt's life and, with the help of expert witnesses, did a thorough job of explaining that information and its relevance to the jury and the trial court." Id. In particular, "substantial social history testimony was presented at the Penalty Phase of the trial by defendant's Counsel." Id. at 663. The PC court further concluded that even if trial counsel had requested preparation of a narrative social history, "such would have no capacity to cause a different result in the penalty phase." Id. at 664.

There was evidence in the record to support the PC court's conclusions. During the pre-trial mental retardation hearing, trial counsel investigated and presented evidence regarding Pruitt's educational history through both expert witness and lay witness testimony. (See supra Part II-B-1 (testimony of Dr. Hudson); Trial Tr. 1030-36 (direct examination of Pruitt's teacher Rex Nichols); Trial Tr. 1754-61 (cross examination of Pruitt's teacher Randy Tutterow)). Trial counsel also explored in great detail Pruitt's social history (which included, inter alia, his family background, formative childhood experiences, characteristic documented behaviors as an adult, and his work history). Dr. Hudson testified on direct examination to Pruitt's work history. (Trial Tr. 1261-66; see supra Part II-B-1). Trial counsel then presented facts from Pruitt's social history to Dr. Hudson in hypothetical form (because trial counsel had not yet presented in-court testimony of these facts) and asked him to assess Pruitt on the ten AAMR measures of adaptive functioning based on these facts.[34] (See supra Part III-B-1(b); Trial Tr. 1254-1298.)

During the penalty phase of trial, Pruitt's relatives (mother Rena, brother Mark, father Marion, and sisters Jennifer and Francine) corroborated the previous trial testimony about his educational and social history. Also during the penalty phase, trial counsel presented extensive

---

[34] See supra n.3 for the list of the ten AAMR measures of adaptive functioning.

30

testimony about Pruitt's family history. On direct examination, Pruitt's mother Rena Pruitt testified that she had had physical fights with his father Marion "[p]robably every weekend" when he was growing up. (Trial Tr. 5023.) She also testified that her brother "slapped Tommy [Pruitt] in the face once," id. at 5037, and that after this incident Pruitt had almost gotten into a violent fight with her brother, id. at 5038. On direct examination, Pruitt's father Marion Pruitt testified that he often would get frustrated at his son, resulting in physical and verbal abuse. See id. at 5196 ("he'd take a drink of [gasoline] or something like that, you know, and I called him retarded"; "I'd get drinking, you know, and call him bad names."). He acknowledged that he and Pruitt's mother divorced when Pruitt was in his late teens because he "was drinking too much and playing around with the women." Id. at 5182-83. He also testified that when Pruitt was a toddler and was injured in an accident that required hospitalization, he only had "[a]bout five or $10" set aside to pay for medical care. Id. at 5181. Both Pruitt's mother and sister Jennifer testified that his father was paranoid that "somebody's out to get him." Id. at 5025, 5244.

Trial counsel also presented substantial evidence of Pruitt's penal and medical histories. They introduced Pruitt's two mental health diagnoses, one from 1996 while he was incarcerated in the Federal BOP and the other from 2001 while he was incarcerated at the Indiana DOC pending trial in this case. They presented testimonies of Drs. Hudson and Golden interpreting these diagnoses. See supra Part III-B-2. After reviewing Pruitt's history and performing neuropsychological testing, Dr. Hudson also testified to "a number of instances . . . where he [Pruitt] had some sort of impact to the head, leading to the need for emergent care from a hospital" and that "at a young age [he] liked to ingest kerosene and gasoline." (Trial Tr. 1243-44.) These past events caused "brain impairment," lowered his IQ, and decreased his ability to exhibit "social behavior." Id. at 1245, 47.

Our review of the record does not lead us to a conclusion opposite the conclusion reached by the PC court. We find that trial counsel was not deficient for failing to prepare a comprehensive, written narrative social history.

Pruitt's next ineffective assistance claim is that trial counsel was deficient for "fail[ing] to request the jury be instructed that if Pruitt was mentally retarded he was ineligible for the death penalty under the Fifth, Sixth, and Eighth Amendments to the United States Constitution." (Br. of Pet.-Appellant at 56, citing Apprendi v. New Jersey, 530 U.S. 466, 476 (2000); Atkins, 536 U.S. 304; and Ring v. Arizona, 536 U.S. 584 (2002).) The PC court found that trial counsel did in fact tender such an instruction, but that "[s]uch instructions and verdict forms were correctly refused" because Indiana law directs that the judge, not the jury, makes the determination of whether an individual is mentally retarded and eligible for the death penalty. (App. to Br. of Pet.-Appellant 664.) The court also viewed this claim as barred by res judicata; it concluded that this was "an attempt to reiterate his mental retardation claim that was already appropriately adjudicated by the Indiana Supreme Court. As such, it fails to show deficient performance or prejudice." Id. The PC court concluded that "Pruitt fails to show ineffective assistance of trial counsel by failing to tender jury instructions and verdict forms stating that if the jury found that Pruitt was mentally retarded, he was ineligible for a sentence of death." Id.

Our review of the record shows that trial counsel tendered "Proposed Final Instruction No. 4," which read:

> Before you may consider a verdict of death or life imprisonment without parole, you must unanimously find the State has proven beyond a reasonable doubt that Tommy Pruitt is not mentally retarded. If you do not so unanimously find, you must return a verdict against death or life imprisonment without parole. The Court will provide to you verdict forms as to whether or not Tommy Pruitt is not mentally retarded beyond a reasonable doubt.

(Appellant's App. 2118.)

In Atkins, the United States Supreme Court held that the execution of an individual with mental retardation violates the Eighth Amendment's prohibition against "cruel and unusual punishments." 536 U.S. at 321. Indiana Code §§ 35-36-9-1 through 7 (2004) provide the procedures by which a trial court is to determine whether a defendant is an individual with

mental retardation and therefore not eligible for the death penalty. When a defendant files a petition alleging that he or she is an individual with mental retardation, the <u>judge</u> is to rule on the petition after a hearing to be held not later than ten days before the initial trial date. I.C. § 35-36-9-5 (emphasis added). If the <u>judge</u> determines that the defendant is an individual with mental retardation, the part of the state's charging instrument that seeks a death sentence against the defendant shall be dismissed. <u>Id.</u> § 6 (emphasis added).

This Court held in Pruitt's direct appeal that the above procedure, which directs the judge, and not the jury, to make the pre-trial determination of mental retardation, did not violate the Sixth Amendment of the Federal Constitution. We reasoned that if mental retardation was a sentence-enhancing factual determination, the jury would be constitutionally mandated to make that determination. <u>Pruitt</u>, 834 N.E.2d at 112, <u>citing</u> U.S. Const. amend. VI; <u>Blakely v. Washington</u>, 542 U.S. 296, 301 (2004); <u>Ring</u>, 536 U.S. at 602; <u>Apprendi</u>, 530 U.S. at 482-83. We held, however, that mental retardation status was not a sentence-enhancing factual determination; and that instead "a pretrial determination by the court of whether a defendant is mentally retarded reduces the potential maximum punishment but does not enhance it." <u>Pruitt</u>, 834 N.E.2d at 112-13. We held, "[t]herefore, the Sixth Amendment is not in play with regard to the pretrial determination of mental retardation in death sentence cases." <u>Id.</u> at 113.

Indiana law is therefore clear that the trial court, and not the jury, makes the determination of whether a defendant is an individual with mental retardation for purposes of eligibility for the death penalty. Here, the court made just such a determination that Pruitt is not an individual with mental retardation after the pre-trial mental retardation hearing. (<u>See</u> Appellant's App. 575.) The court then properly rejected trial counsel's tendered instruction to the jury on this issue at the end of trial. Our review of the record and of relevant Indiana and federal law does not lead us to a conclusion opposite the conclusion reached by the PC court. We agree with the PC court's conclusion that trial counsel was not deficient for "their attempt to substitute the jury as fact-finder for this determination." (App. to Br. of Pet.-Appellant 664.)

Pruitt's next claim of ineffective assistance is that trial counsel was deficient for (1) failing to argue prosecutorial misconduct when the State introduced a pre-autopsy photograph of Officer Starnes depicting his gunshot wounds, wounds from surgical manipulation, and extreme swelling of his body; (2) failing to object and renew his motion for mistrial during closing argument when the prosecutor read the rest of a poem entitled "Part of America Died" after the court had warned him to "be careful regarding victim impact," (Trial Tr. 6295.); and (3) failing to object to the prosecutor's brief reference in closing argument connecting Pruitt to notorious murderers Jeffrey Dahmer, Ted Bundy, Adolph Hitler, and Timothy McVey. (Br. of Pet.-Appellant at 57-61.) Pruitt contends that "[t]rial counsel's failure to recognize and argue the misconduct of the prosecutor fell below prevailing professional norms and put Pruitt in 'grave peril' and 'infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Id. at 61 (citations omitted).

The PC court concluded at the outset that "these [prosecutorial misconduct] claims were available on direct appeal but were not raised" and therefore "are barred by procedural default." (App. to Br. of Pet.-Appellant 657.) It proceeded to address these claims as if they were properly preserved for review and concluded that "Pruitt failed to establish that the prosecutor committed misconduct." Id. at 664; see also id. at 657-59. It then applied the prejudice prong of Strickland's test for ineffectiveness assistance of counsel and concluded that "[n]one of these allegations, even if proved, would undermine the Court's confidence in the outcome of the trial. Accordingly, he [Pruitt] cannot show deficient performance or prejudice with regard to his allegation that trial counsel ineffectively responded to these alleged instances of prosecutorial misconduct." Id. at 664.

Our review of the record shows that the PC court was correct in concluding that petitioner raised no prosecutorial misconduct claims on direct appeal and that they are therefore barred by procedural default. See Collins v. State, 817 N.E.2d 230, 232 (Ind. 2004) ("It is also well-settled that, because a post-conviction relief proceeding is not a substitute for direct appeal

but rather a process for raising issues unknown or not available at trial, an issue known and available but not raised on direct appeal may not be raised in post-conviction proceedings." (citation omitted)).

## VIII

Pruitt's final ineffective assistance claim is that trial counsel's performance was deficient for not offering any evidence regarding the impact that his execution would have on his family. He contends that trial counsel mistakenly believed that the court's motion in limine during trial precluded presentation of execution impact testimony. Petitioner concludes that "[t]his evidence, taken together with the evidence presented at Phase II, 'might well have influenced the jury's appraisal of [Pruitt's] culpability.'" (Br. of Pet.-Appellant at 62, quoting Wiggins, 539 U.S. at 537.)

In his post-conviction petition, Pruitt framed this issue as one of trial court error for precluding execution impact evidence,[35] and not as an ineffective assistance of trial counsel claim. (See App. to Br. of Pet.-Appellant at 648-49.) The PC court found that this claim was initially "barred by procedural default because [it was] fully available for direct appeal but [was] not raised." Id. at 649. However, it addressed the merits of this claim in its order. The PC court found that "the emotional effect of Pruitt's sentence on his family is entitled to very little mitigating weight at most." Id. at 654. "Indeed, the Indiana Supreme Court observed that the more weighty mitigating circumstances in this case do not outweigh the particularly weighty aggravating circumstance here." Id., citing Pruitt, 834 N.E.2d at 120-21. The PC court concluded that "Pruitt fails to show any prejudice from the exclusion of 'family impact

---

[35] During direct examination of defense witness Jennifer Day, Pruitt's younger sister, she blurted out, "God, please don't kill him." (Trial Tr. 5251.) At a bench conference, the State objected to "her voluntary statements" and made a motion in limine. Id. at 5251-52. The trial court granted the motion in limine. Id. at 5252. Pruitt claimed in his post-conviction petition that the trial court committed reversible error with this ruling.

evidence'" and that "the Court finds any arguable error harmless beyond a reasonable doubt." (App. to Br. of Pet-Appellant 654.)

The PC court did not make any determination as to whether trial counsel was ineffective for not offering any execution impact evidence. This was because Pruitt never presented this claim in his direct appeal or in his post-conviction petition, even though it was available to him. Petitioner argues this claim for the first time in this appeal, and the State did not respond to it in its brief. We conclude that this claim is barred by procedural default. See Collins, 817 N.E.2d at 232 ("It is also well-settled that, because a post-conviction relief proceeding is not a substitute for direct appeal but rather a process for raising issues unknown or not available at trial, an issue known and available but not raised on direct appeal may not be raised in post-conviction proceedings." (citation omitted)).

As a result of our analysis set forth in Parts II through VIII, supra, we conclude that Pruitt was not denied his right to effective assistance of trial counsel.

## IX

Pruitt next argues that his conviction and sentence must be vacated because his appellate counsel were ineffective for failing to raise three issues on direct appeal.[36] His arguments here (two of which mirror his claims of trial counsel ineffectiveness) are that appellate counsel should have challenged on direct appeal: (1) the prosecutor's statements during the penalty phase and his introduction of Officer Starnes's pre-autopsy photo during the guilt phase of trial; (2) trial counsel's failure to instruct the jury that Pruitt could not be sentenced to death if he was an individual with mental retardation; and (3) the constitutionality of the exclusion of prospective jurors during voir dire based on their religious beliefs.

---

[36] This Court has noted that "appellate ineffective assistance of counsel claims generally fall into three basic categories: (1) denying access to appeal; (2) waiver of issues; (3) failure to present issues well." Allen, 749 N.E.2d at 1167 n.9 (citation omitted). Pruitt's claims fall under the second category.

36

The standard for gauging appellate counsel's performance is the same as that for trial counsel. Stephenson, 864 N.E.2d at 1046 (citation omitted).[37]   Therefore, "[t]o prevail on an ineffective assistance of counsel claim, [the petitioner] must show both deficient performance and resulting prejudice." Allen, 749 N.E.2d at 1166 (quoting Williams v. State, 706 N.E.2d 149, 154 (Ind. 1999), cert. denied, 529 U.S. 1113 (2000)). See also Strickland, 466 U.S. at 687. As for the first prong − counsel's performance − we presume that counsel provided adequate representation. Allen, 749 N.E.2d at 1166. Accordingly, "[c]ounsel is afforded considerable discretion in choosing strategy and tactics, and we will accord that decision deference." Id. (quoting Williams v. State, 733 N.E.2d 919, 926 (Ind. 2000)). The second prong − the prejudicial effect of counsel's conduct − requires a showing that "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Williams v. Taylor, 529 U.S. 362, 391 (2000) (quoting Strickland, 466 U.S. at 694).

Applying these legal standards, the PC court concluded that "Pruitt received constitutionally adequate representation" from his appellate counsel during his direct appeal. (App. to Br. of Pet.-Appellant 686.) It made certain findings of fact on each of Pruitt's three claims to support its conclusion.

Pruitt's first claim is that appellate counsel rendered ineffective assistance by failing to raise a claim of prosecutorial misconduct. It is well established that in order to prevail on a

---

[37] Despite these overlapping standards, this Court has noted some unique characteristics in our analysis of claims of ineffective assistance of appellate counsel:

> Appellate counsel's performance, as to the selection and presentation of issues, will . . . be presumed adequate unless found unquestionably unreasonable considering the information available in the trial record or otherwise known to appellate counsel. To prevail on a claim of ineffective assistance of appellate counsel, a defendant must therefore show from the information available in the trial record or otherwise known to appellate counsel that appellate counsel failed to present a significant and obvious issue and that this failure cannot be explained by any reasonable strategy.

Allen, 749 N.E.2d at 1166 n.8 (quoting Ben-Yisrayl, 738 N.E.2d at 261).

claim of ineffective assistance due to the failure to object, a petitioner for post-conviction relief must show an objection would have been sustained if made. Overstreet v. State, 877 N.E.2d 144, 155 (Ind. 2007); Wrinkles v. State, 749 N.E.2d 1179, 1192 (Ind. 2001); Timberlake v. State, 690 N.E.2d 243, 259 (Ind. 1997). For the same reason, in order to prevail on a claim of ineffective assistance due to prosecutorial misconduct, a petitioner for post-conviction relief must show that prosecutorial misconduct in fact occurred. See Lee v. Davis, 328 F.3d 896, 899 (7th Cir. 2003) ("Because the Court of Appeals found no prosecutorial misconduct, it also found that Lee's … appellate counsel [had not been] ineffective in failing to raise misconduct on Lee's direct appeal.") (footnote omitted). To the extent that Pruitt's claims of ineffective assistance of appellate counsel due to prosecutorial misconduct are available for our review, we hold that they are not availing because he has not demonstrated that he was the victim of prosecutorial misconduct.

In point of fact, the PC court made certain findings of fact from which it concluded that "Pruitt failed to establish that the prosecutor committed misconduct." (App. to Br. of Pet.-Appellant 664.) As for the first claim that the prosecutor committed misconduct by introducing Officer Starnes's pre-autopsy photograph to the jury, the PC court found that the "Indiana Supreme Court determined on direct appeal that the photograph's admission was proper." Id. at 659, citing Pruitt, 834 N.E.2d at 117-18. It concluded from this finding that "[t]here was no error in the admission of the exhibit, so the prosecutor could not have committed misconduct." (App. to Br. of Pet.-Appellant 659.)

The PC court was correct. In Pruitt's direct appeal, this Court did affirm the trial court's admission of Officer Starnes's pre-autopsy photograph over Pruitt's Evid. R. 403 objection. See Pruitt, 834 N.E.2d at 117-18. We acknowledged that the "the photograph was disturbing to some jurors," but we concluded after reviewing the photograph and the evidence surrounding its admission that "the trial court was within its discretion in deciding that the photograph's probative value . . . was not outweighed by a tendency to inflame or prejudice the jury." Id. at 117, 118.

As for the second claim that the prosecutor committed misconduct by inserting victim impact evidence through a poem read in closing argument, the PC court found that

> [t]he poem at issue constituted fair comment on the evidence presented by Pruitt in an attempt to diminish his punishment for murdering a police officer. It was not evidence. The comment was brief, and upon objection by Pruitt, the prosecutor moved on and did not return to the matter. Nonetheless, Pruitt specifically rejected the trial court's offer of an admonition to the jury. Trial Transcript at 6294-95. An admonition would have cured any error—and the trial court would have given it—but Pruitt would ask only for a mistrial. Id. This waives the claim. Robinson v. State, 693 N.E.2d 548, 552 (Ind. 1998).

(App. to Br. of Pet.-Appellant 658-59.)

The PC court concluded from these findings that "Pruitt's decision [to not ask the court for an admonition] further demonstrates that this comment did not place Pruitt in grave peril. The probable persuasive effect of this brief comment, in light of the entire evidence and argument presented, is minimal, if any. Pruitt has failed to prove the State committed misconduct." Id. at 659.

Our review of the record substantially supports the PC court's findings of fact regarding the prosecutor's reading of a poem during closing argument. Before he read the short poem, the prosecutor had reminded the jury that the decedent was a police officer, and that this was an aggravating circumstance necessary to seek the death penalty against Pruitt. He summarized his closing argument by reading "Part of America Died," which described the importance of police officers to public safety and the resulting sadness when one is murdered. In the middle of the poem, defense counsel asked for a sidebar conference with the prosecutor and the court and moved for a mistrial. (Trial Tr. 6293-94.) The court rejected this request but did ask defense counsel if he wanted the court to issue an admonishment to the jury. Id. at 6294. Defense counsel rejected the court's offer, stating that "[a]nything that we do is only going to serve to highlight it." Id. at 6294-95. The court then warned prosecutor to "be careful regarding victim impact." Id. at 6295. The prosecutor promised to move on, but contrary to the PC court's finding, he did read the rest of the poem. See id. at 6295-96. Defense counsel made no further challenge to the poem.

Our review of the PC court's findings does not lead us to an opposite conclusion than that reached by the PC court. We agree with the PC court that the prosecutor's reading of "Part of America Died" did not constitute misconduct which placed Pruitt in grave peril such that a mistrial was required. Beyond that, counsel was offered an admonishment but declined. Under these circumstances, there was no meritorious issue available for appeal.

The third claim, that the prosecutor committed misconduct when he made a comment connecting Pruitt to notorious murderers, was not presented in Pruitt's post-conviction petition, the PC court did not address it, and it is therefore not available for this Court's review. See Allen, 749 N.E.2d at 1171 ("Issues not raised in the petition for post-conviction relief may not be raised for the first time on post-conviction appeal.") (citations omitted).

As for Pruitt's second ineffective assistance of appellate counsel claim, that appellate counsel failed to instruct the jury that Pruitt could not be sentenced to death if he was an individual with mental retardation, the PC court found that "[c]ounsel did raise a very similar argument on direct appeal, and our Supreme Court determined that the jury had no role in determining a defendant's eligibility for the death penalty based on alleged mental retardation." (App. to Br. of Pet.-Appellant 687, citing Pruitt, 834 N.E.2d at 110-11.) It also found that "[t]he Indiana Supreme Court would have not been receptive to this claim, and appellate counsel properly decided not to raise it." Id. at 687. The PC court concluded that "Pruitt fails to demonstrate either deficient performance or prejudice." Id. As discussed earlier in this opinion, we affirmed the PC court's finding of no ineffective assistance of trial counsel regarding this claim and for essentially the same reasons affirm its finding of no ineffective assistance of appellate counsel. See Lambert, 743 N.E.2d at 746.[38]

Pruitt's final claim of ineffective assistance of appellate counsel was initially framed as a freestanding claim of trial court error in his post-conviction petition. (See App. to Br. of Pet.-Appellant 648.) The PC court found at the outset that this claim was "barred by procedural

_____

[38] "Lambert claims that his appellate counsel should have argued that the prosecutor's closing argument was improper and should have raised certain issues related to jury instructions. As discussed, we affirmed the post-conviction court's finding of no ineffective assistance of trial counsel in these respects and for essentially the same reasons affirm its finding of no ineffective assistance of appellate counsel."

default because [it was] fully available for direct appeal but [was] not raised." Id. at 649. It did go on to address the merits of the claim and found that "Pruitt fails to identify for the Court which potential jurors were improperly excluded, nor does he state the legal bases upon which he contends that their beliefs were protected." Id. at 650. Construing these claims as "alleging that some potential jurors were wrongly dismissed due to their opposition to the death penalty . . .[, t]he Court's review of voir dire fails to reveal that the trial court improperly applied Witherspoon v. Illinois, 391 U.S. 510 (1968), and its progeny, including Wainwright v. Witt, 469 U.S. 412 (1985), and Morgan v. Illinois, 504 U.S. 719 (1992)." Id.

Pruitt then alleged in his post-conviction petition that appellate counsel was ineffective for failing to raise his freestanding claims of trial court error, including this claim of juror exclusion, on direct appeal. The PC court found that "[n]one of these allegations are meritorious, let alone clearly stronger than the ones appellate counsel actually presented. Nor are they reasonably likely to have prevailed on appeal." Id. at 688. It concluded that "Pruitt utterly fails his burden to meet either prong of the ineffective assistance of counsel test." Id.

Our review of the record shows that in his proposed findings of fact to the PC court, Pruitt did in fact identify which potential jurors or veniremen were allegedly improperly excluded. See id. at 486. He also did state the legal bases upon which he believed they were improperly excluded. See id. at 486-87 ("The three prospective jurors who were dismissed based on their religious views were denied their rights under the First and Fourteenth Amendments to the United States Constitution." Id. at 487.) Our review of the voir dire transcript shows that all three dismissed veniremen made it unmistakably clear that they would not impose the death penalty under any circumstances. The first of these jurors responded to a question during voir dire that he would not consider imposing the death penalty in this case, regardless of the evidence presented at trial. (See Trial Tr. 1884-89.) The second of these jurors responded in the same way. See id. at 1940-42. When the prosecutor asked the third of these jurors if his stated opposition to the death penalty could be swayed by the court or by argument at trial, he responded, "Well, I think it's wrong. I think there are other alternatives." Id. at 2038. Our review of the record does not lead us to a conclusion opposite the conclusion reached by the PC

41

court, that the trial court properly applied <u>Witherspoon v. Illinois</u> and its progeny[39] and did not improperly exclude these three potential jurors.

Finally, Pruitt contends that appellate counsel was ineffective for failing to "present a Sixth and Fourteenth Amendment challenge to the trial court granting exclusions based on religious beliefs." (Br. of Pet.-Appellant at 70.) He argues for an extension of <u>Powers v. Ohio</u>, 499 U.S. 400 (1991), in support of this claim. <u>Powers</u> holds that race-based exclusions of jurors prohibited by <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986), are equally prohibited when the defendant and the excluded veniremen are not of the same race. <u>Powers</u>, 499 U.S. at 416. Pruitt

---

[39] <u>Witherspoon v. Illinois</u> held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U.S. 510, 522 (1968). The Court stated in a footnote, however, that

> The most that can be demanded of a venireman in this regard is that he be willing to <u>consider</u> all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings . . . We repeat, however, that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would <u>automatically</u> vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them . . . .

<u>Id.</u> n.21 (emphases in original).

The PC court here also cited two of <u>Witherspoon</u>'s progeny, <u>Wainwright v. Witt</u> and <u>Morgan v. Illinois</u>. <u>Wainwright v. Witt</u> "clarif[ied] our decision in <u>Witherspoon</u>" and held that the standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" 469 U.S. 412, 424 (1985) (<u>quoting</u> <u>Adams v. Texas</u>, 448 U.S. 38, 45 (1980)). The <u>Wainwright</u> court noted that "in addition to dispensing with <u>Witherspoon</u>'s reference to 'automatic' decisionmaking, this standard likewise does not require that a juror's bias be proved with 'unmistakable clarity.'" <u>Wainwright</u>, 469 U.S. at 424. The Court concluded that the trial court judge's application of this standard is to be given deference. <u>See id.</u> at 425-26 ("Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. For reasons that will be developed more fully <u>infra</u>, this is why deference must be paid to the trial judge who sees and hears the juror."). Seven years after <u>Wainwright</u>, the Court held in <u>Morgan v. Illinois</u> that "<u>Witherspoon</u> limited a State's power broadly to exclude jurors hesitant in their ability to sentence a defendant to death, but nothing in that decision questioned 'the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear . . . that they would <u>automatically</u> vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them . . . .'" 504 U.S. 719, 732 (1992) (<u>quoting</u> <u>Witherspoon</u>, 391 U.S. at 522 n.21).

contends that just like the excluded jurors in Powers, "so were the three jurors in Pruitt's case denied the same right [to serve on a jury] due to their religious beliefs under the First and Fourteenth Amendments." (Br. of Pet.-Appellant at 71.)

We find no reason to extend Powers to this case.[40] Powers is plainly inapplicable because here the three excluded veniremen were excused not based on their race, but because of their religious beliefs against the death penalty. Instead, as Pruitt acknowledges, I.C. § 35-37-1-5(a)(3) goes directly to this issue and provides that if the state is seeking a death sentence, it is a good cause for challenge to a prospective juror if that "person entertains such conscientious opinions as would preclude the person from recommending that the death penalty be imposed." In Stephenson, the petitioner argued that appellate counsel was ineffective for not raising the issue that prospective jurors were excused because of their religious beliefs. He contended that "Indiana Code section 35-37-1-5(a)(3), which allows such exclusion, 'suppressed those prospective jurors' rights to practice their religion.'" 864 N.E.2d at 1047 (footnote omitted). This Court held that "[w]e rejected this contention in Ben-Yisrayl v. State, 753 N.E.2d 649, 655 (2001) and adhere to that view. Accordingly, appellate counsel were not ineffective for their decision not to raise these issues on appeal." Id. We find Stephenson controlling here. Our review of the law on this issue does not lead us to a conclusion opposite the conclusion reached by the PC court: that Pruitt's appellate counsel were not ineffective for not raising this claim of juror exclusion on direct appeal.

We conclude that Pruitt was not denied his right to effective assistance of appellate counsel.

---

[40] This Court has held that "precedent barring the racially discriminatory use of peremptory challenges does not preclude the exclusion of prospective jurors who would not recommend the death penalty under any circumstances." Ben-Yisrayl, 753 N.E.2d at 655-56 (citing Lambert v. State, 643 N.E.2d 349, 352 (Ind. 1994)).

43

Pruitt asserted a claim of newly discovered evidence in his "Amended Petition For Post-Conviction Relief." (See App. to Br. of Pet.-Appellant 124.) The PC court reviewed this contention and found that "Pruitt claims he has newly discovered evidence of scientific research into inflation of IQ scores and about his background." Id. at 659-60. The PC court rejected these claims and refused to order a new trial after applying this Court's nine-factor "Fox test" for what constitutes newly discovered evidence.[41] See id. at 660. In this appeal, Pruitt contends that the PC court should have applied a different test for previously undiscovered evidence, the one enunciated by I.C. § 35-50-2-9(k). He contends that in light of this latter test, the PC court's findings are "clearly erroneous," (Br. of Pet.-Appellant at 7), and that "the essentially uncontested PCR evidence that Pruitt is mentally retarded and paranoid schizophrenic is undeniably new evidence" that undermines confidence in his death sentence. Id. at 28-29.

> Indiana Code § 35-50-2-9(k) states in relevant part:
>
> A person who has been sentenced to death and who has completed state post-conviction review proceedings may file a written petition with the supreme court seeking to present new evidence challenging the person's guilt or the appropriateness of the death sentence if the person serves notice on the attorney general. The supreme court shall determine, with or without a hearing, whether the person has presented previously undiscovered evidence that undermines confidence in the conviction or the death sentence. If necessary, the supreme court may remand the case to the trial court for an evidentiary hearing to consider the new evidence and its effect on the person's conviction and death sentence . . . .

(emphases added).

Even though this statute on its face only applies to a defendant who has been sentenced to death and "who has completed state post-conviction review proceedings," this Court held in

---

[41] In order for a court to order a new trial based on newly discovered evidence, defendant must show: "(1) that the evidence has been discovered since the trial; (2) that it is material and relevant; (3) that it is not cumulative; (4) that it is not merely impeaching; (5) that it is not privileged or incompetent; (6) that due diligence was used to discover it in time for trial; (7) that the evidence is worthy of credit; (8) that it can be produced upon a retrial of the case; and (9) that it will probably produce a different result." Fox v. State, 568 N.E.2d 1006, 1007 (Ind. 1991) (citation omitted).

Stephenson that the "standard set forth in Indiana Code section 35-50-2-9(k) applies to newly discovered evidence claims in capital postconviction proceedings as well as to newly discovered evidence claims after the completion of capital post-conviction review." 864 N.E.2d at 1050. We therefore apply this standard to our review of both the PC court's findings and to Pruitt's previously undiscovered evidence claims in this appeal.

The standard for previously undiscovered evidence in I.C. § 35-50-2-9(k) "place[s] on the defendant the burden of showing that the proffered evidence was 'previously undiscovered' and that it 'undermines confidence' in either the guilt, the penalty, or both." Id. (emphasis added). The language "'previously undiscovered' is functionally equivalent to 'newly discovered' under Trial Rule 60(B). Thus . . . the evidence must be 'discovered since the trial' and the defendant must have 'used due diligence to discover it before trial.'" Id. (emphasis added). The "statute's reference to evidence that 'undermines confidence' in the conviction uses the same language as the familiar standard announced in Strickland v. Washington, 466 U.S. 668, 669 (1984) for the prejudice prong of claims of ineffective assistance of counsel: 'a reasonable probability . . . that the result of the proceeding would have been different.'" Id. at 1049. Under this standard, a "reasonable probability" is established if "the petitioner shows that the new evidence might reasonably have produced a different result." Id., citing Strickland, 466 U.S. at 694.

In this appeal, Pruitt advances what he characterizes as "new evidence impacting the mental retardation finding," (Br. of Pet.-Appellant at 11), and "new evidence of Pruitt's mental disabilities, establishing schizophrenia," id. at 16. We will evaluate each in turn.

**A**

Pruitt first contends that "[n]umerous new studies reveal that the use of anti-psychotics can improve the cognition in schizophrenics." Id. at 11. He then argues that Pruitt was taking Trilafon, an anti-psychotic, when he scored an unusually high 76 on the WAIS-III IQ test administered by Dr. Olvera and that "[t]his new evidence that Dr. Olvera's 76 was elevated by the anti-psychotic is critical to the mental retardation inquiry." Id. Our review of the record

45

shows that this was not previously undiscovered evidence because it is cumulative of Dr. Golden's testimony on this same issue during trial.[42]  See also supra, Part III-B-1(a).

Pruitt next contends that Dr. Schmedlen, the court-appointed trial expert on mental retardation, admitted in his deposition before the PCR hearing that he was not very familiar with the "Flynn Effect" and that "[n]ow Dr. Schmedlen concedes that it is relevant to the IQ score of 76." (Br. of Pet.-Appellant at 12.)  Our review of the record shows that Dr. Schmedlen testified in his deposition that "I don't know whether the Flynn Effect on a test that's only four or five years old, whether that's sort of swallowed up by the standard error of measurement or whether it's separate and apart . . . I'm not sure there's a standard in the field yet."  (Pet.-Appellant Ex. #41 at 24-25 in Pet.-Appellant Vol. of Ex. IV.)  This testimony squarely contradicts Pruitt's claim that "now Dr. Schmedlen concedes that it [the Flynn Effect] is relevant to the IQ score of 76."  Dr. Schmedlen's deposition testimony regarding the Flynn Effect is not previously undiscovered testimony that undermines confidence in the trial court's mental retardation finding.

Pruitt's third contention is that during the PCR hearing, Dr. Schmedlen admitted that he made a mistake during trial when he normed both Pruitt's Otis-Lennon achievement test score and his Iowa Basic Skills achievement test score to Pruitt's grade rather than to his age.  He contends that because Dr. Schmedlen did not consider the fact that Pruitt was approximately two years older than the group of students with whom he was being compared, Pruitt would "look better on paper than he actually performed."  (Br. of Pet.-Appellant at 13.)  Our review of Dr. Schmedlen's deposition testimony given before the PCR hearing shows that he did indeed consider and testify to "age-based results and grade-based results" during trial.[43]  He also did

---

[42] Trial counsel presented defense expert Dr. Golden, who testified that if ". . . given the appropriate antipsychotic drug," the IQ scores of those with psychiatric disorders "may go up significantly because of improvements in attention and focusing."  (Trial Tr. at 1500.)  His review of Pruitt's DOC records showed that Pruitt was on the antipsychotic medication Trilafon at the time that he took Dr. Olvera's WAIS-III IQ test.  Id. at 1501.

[43] The relevant colloquy at Dr. Schmedlen's deposition is as follows:

Q: In evaluating some of Mr. Pruitt's tests, the Iowa skills testing –

…

admit in his deposition that he did not consider the fact that Pruitt was two years older than those he was being compared with. (Pet.-Appellant Ex. #41 at 18 in Pet. Appellant Vol. of Ex. IV.) When asked at his deposition, "[w]hat impact do you think that information has?," Dr. Schmedlen responded, "[w]ell, if he was a little bit older, and depending on what the exact norms are – I'd have to look at them – it's possible that he might have performed – looked better on paper." Id. Evidence of Dr. Schmedlen's omission is not previously undiscovered evidence because Pruitt has not shown that he or his counsel exercised due diligence to elicit this testimony during trial.[44] Even if it was previously undiscovered evidence, Dr. Schmedlen's deposition testimony about its uncertain impact on Pruitt's mental retardation finding shows that it would not have undermined confidence in his conviction or sentence.

Pruitt's fourth contention is that at the PCR hearing, his counsel presented new evidence that he was referred to special education again in the 8th grade. (See Br. of Pet. Appellant at 13.) He argues that the "trial testimony of Rex Nichols and Randy Tutterow, two of Pruitt's elementary school teachers, was materially misleading" because they testified that he was no longer in special education classes after the third grade. Id. Earlier in this opinion, we held that even though trial counsel did not present the fact that Pruitt was referred to special education in eighth grade, this omission was not prejudicial because trial counsel presented other extensive testimony regarding his subaverage educational history and the special educational services provided to him. See supra, Part II-B-3. Because the failure to present this fact was not

Q: – and the Otis Lennon –

. . .

Q: – testing, there became a question about age-based results and grade-based results; do you recall that?

A: At our – in normal discussion or during the trial? During the testimony?

Q: During the trial . . . .

(Pet.-Appellant Ex. #41 at 17 in Pet.-Appellant Vol. of Ex. IV) (emphasis added).

[44] See Stephenson, 864 N.E.2d at 1052 ("The requirement of due diligence includes a showing of why the evidence was unavailable if the witnesses were known to the defense. Without some showing of intentional withholding by the witness, a person who testifies at trial can be assumed to have been available for whatever exploration is appropriate. Similarly, if testimony was not elicited, without more it is reasonable to assume counsel made a decision not to open the subject.")

prejudicial, even if we assume, arguendo, that this fact was previously undiscovered, we hold that it does not undermine Pruitt's conviction or sentence.

Pruitt's fifth contention is that his counsel presented new evidence at the PCR hearing that mentally retarded individuals are able to fill out job applications and to obtain a commercial driver's license (CDL). He contends that the trial court relied on testimony about Pruitt's ability to do these tasks to conclude that he was not an individual with mental retardation, and that this conclusion is undermined by the new evidence. (See Br. of Pet.-Appellant at 14.) As discussed earlier in this opinion, trial counsel explained in detail Pruitt's work history and his ability to obtain a CDL despite having substantial intellectual deficits. See supra, Part II-B-1. The evidence introduced at the PCR hearing on this issue was cumulative of the evidence at trial, and thus does not constitute previously undiscovered evidence.

Pruitt's sixth and final contention is that petitioner's expert witness Dr. Golding's testimony at PCR was previously undiscovered evidence that undermines the trial testimony of State's expert Dr. Groff. He contends that this testimony, which impugned Dr. Groff's methodology of assessing Pruitt for mental retardation as an "egregious violation" of professional standards, undermines the trial court's finding that Pruitt was not an individual with mental retardation. (Br. of Pet.-Appellant at 14-15.) Our review of the record shows that the trial court based its conclusion that Pruitt was not an individual with mental retardation on evidence from multiple experts in addition to Dr. Groff, including Drs. Schmedlen, Olvera, Golden, and Hudson. (See Appellant's App. 572-74.) The court did cite Dr. Groff's testimony in its findings on mental retardation, id. at 573-74, but it did not rely solely on his testimony to arrive at its conclusion. Therefore, even assuming, arguendo, that Dr. Golding's PCR testimony impugning Dr. Groff's trial testimony was previously undiscovered, we hold that it would not have undermined the trial court's finding.

**B**

Pruitt's first contention of previously undiscovered evidence establishing schizophrenia is the testimony of his trial counsel and lead appellate counsel at the PCR hearing. His claim is that

these counsel were unavailable to testify in the prior proceedings, and that their "own personal observations and interactions with him [Pruitt]" constituted previously undiscovered evidence that undermines confidence in his death sentence. (See Br. of Pet.-Appellant at 16-19.) Earlier in this opinion, we concluded that trial counsel were not deficient in their presentation of evidence regarding Pruitt's mental illness. See supra, Part III-B-2. In point of fact, trial counsel presented the testimony of three mental health experts on this issue: Drs. Schmedlen, Hudson, and Golden. Id. In light of this expert testimony at trial, the lay testimony of counsel at the PCR hearing regarding their observations and interactions with Pruitt is at best cumulative and therefore does not constitute previously undiscovered evidence.

Pruitt's next contention is that Dr. Olvera's PCR hearing testimony, that (1) "when he was assessing Pruitt for mental retardation prior to trial, he had observed signs of possible psychosis" and (2) he "knew of Pruitt's treatment with an anti-psychotic," constituted previously undiscovered evidence that undermined Dr. Schmedlen's trial testimony that Pruitt was not actively psychotic at the time of Dr. Schmedlen's mental retardation evaluation. (Br. of Pet.-Appellant at 19.) Specifically, Pruitt claims that "[w]hen Dr. Schmedlen conducted his mental retardation evaluation, Pruitt was not being medicated" and "Dr. Schmedlen did not review records for the purpose of assessing schizophrenia." Id. First, we note that Dr. Schmedlen's primary responsibility was to testify to Pruitt's mental retardation status, and not to his mental illness. Second, as discussed earlier in this opinion, trial counsel presented extensive testimony from experts Drs. Hudson and Golden that Pruitt exhibited signs of psychosis and schizotypal personality disorder. See supra Part III-B-2. In point of fact, even though Dr. Schmedlen did not specifically assess Pruitt for schizophrenia, Dr. Hudson based his assessment that Pruitt was "potentially psychotic" partially on Dr. Schmedlen's reports of Pruitt's hallucinations. Id., citing Trial Tr. 1215, 1225. In light of this extensive trial testimony on Pruitt's mental illness, Dr. Olvera's testimony at the PCR hearing is cumulative and therefore does not constitute previously undiscovered evidence.

Pruitt's third contention is that his narrative social history, first compiled and admitted at the PCR hearing, constituted previously undiscovered evidence that undermines confidence in his death sentence. (See Br. of Pet.-Appellant at 19-20.) Ms. Haywood, a clinical therapist and

licensed social worker, prepared this social history after reviewing documents and interviewing relevant family members. See id. at 20. As discussed earlier in this opinion, trial counsel thoroughly investigated and presented evidence regarding various aspects of Pruitt's social history, including his mental health history, through both expert witness and lay witness testimony. See supra, Part V. In light of this evidence, Pruitt's narrative social history compiled for the PCR hearing is cumulative and therefore does not constitute previously undiscovered evidence.

Pruitt's final contention is that "[a]t PCR, new evidence was presented by three mental health experts, each of whom concluded that Pruitt clearly suffers, and has suffered for many years, from paranoid schizophrenia." (Br. of Pet.-Appellant at 20.) He claims that all three of these experts, Drs. Coons, Price, and Ballenger, were discovered after trial and that their testimony was "uncontested." Id. He also contends that these experts presented "unrefuted" and "unanimous" testimony that Pruitt met the mitigating circumstances set forth in I.C. § 35-50-2-9(c)(2)[45] and c(6),[46] and that this testimony undermines confidence in the trial court's finding of no mitigating circumstances. Id. at 21. As discussed earlier in this opinion, the diagnosis of schizophrenia from Drs. Coons, Price, and Ballenger is different more in severity than in character from the diagnosis of schizotypal personality disorder presented at trial. See supra Part III-B-2. In addition, the three experts' testimonies at the PCR hearing demonstrate their agreement that there is very little difference between the two diagnoses.[47] In light of these

---

[45] "The defendant was under the influence of extreme mental or emotional disturbance when the murder was committed."

[46] "The defendant's capacity to appreciate the criminality of the defendant's conduct or to conform that conduct to the requirements of law was substantially impaired as a result of mental disease or defect or of intoxication."

[47] Dr. Coons testified that "before he got schizophrenia he has a . . . diagnosis of schizotypal personality disorder . . . all of the symptoms with schizotypal personality disorder are included under schizophrenia." (PC Tr. 458.) Dr. Price diagnosed Pruitt with paranoid schizophrenia, id. at 707, and schizotypal personality disorder, id. at 705. When petitioner's counsel asked, "Doesn't that mean that Dr. Golden was right?" Dr. Price replied, "Very often . . . Very often people that develop schizophrenia have a premorbid and actually coexisting schizotypal personality disorder." Id. at 705. Dr. Ballenger affirmed both Dr. Hudson's and Dr. Golden's trial testimony regarding Pruitt's mental illness. He testified that "he [Dr. Hudson] did notice bizarre schizotypal kind of behavior" and that "Hudson, Golden, and the three of us, all of us see the same thing, even though . . . that [the schizotypal behavior] was not their primary focus." Id. at 589-90. Dr. Ballenger also opined that Dr. Golden's diagnosis, "a decompensated

findings, the mental health diagnoses of Drs. Coons, Price, and Ballenger is cumulative of the mental health testimony presented at trial and therefore does not constitute previously undiscovered evidence. Because we find that no previously undiscovered evidence was presented at the PCR hearing regarding Pruitt's mental illness, we find no reason to disturb the trial court's finding that "Mr. Pruitt does not have a mental condition which would justify his actions or in anyway mitigate for purposes of sentencing." (Trial Tr. 6455.)

We conclude that Pruitt has not presented any previously undiscovered evidence at the PCR hearing that undermines confidence in his death sentence.

## XI

Pruitt next contends that previously undiscovered evidence presented at the PCR hearing establishes that he is in fact mentally retarded and therefore his death sentence is unconstitutional under Atkins. (See Br. of Pet.-Appellant at 78.) He claims that the trial court and the PC court erroneously found that he is not an individual with mental retardation. Id. He also implies that portions of this Court's decision on his direct appeal cast suspicion on the trial court's finding that he is not an individual with mental retardation. Id. at 73.[48]

---

psychotic state of somebody with a schizotypal personality . . . is only a hair different from what I would have said." Id. at 589. He concluded that "Dr. Golden saw the same thing that I did, Dr. Coons, Dr. Price. He saw really the same thing, he just slightly used a different terminology, but he said there was psychosis." Id.

[48] Pruitt argues in his brief to this Court that "[a]t the trial court level, the parties and the judge were facing new issues of constitutional significance. This Court on direct review lowered the burden of persuasion that was in the Indiana statute. Pruitt, 834 N.E.2d at 103. Further, this Court determined that the standard employed by the trial court in determining that Pruitt did not meet the prong of impaired adaptive functioning was too narrow. Id. at 110." (Br. of Pet.-Appellant at 73.) Pruitt is correct that this Court modified the burden of persuasion for defendants to prove mental retardation in Pruitt's direct appeal. See Pruitt, 834 N.E.2d at 103 ("We therefore hold that the state may not require proof of mental retardation by clear and convincing evidence."). However, this determination does not cast doubt on the trial court's mental retardation finding, because "[t]he trial court specifically found that Pruitt failed to show by a preponderance of the evidence that he was mentally retarded." Id. Pruitt is also correct that this Court determined that "the adaptive behavior standard applied by the trial court was too restrictive" and thus "the trial court's finding on that prong is not supportable." Id. at 110. However, we noted that

Earlier in this opinion, we addressed and rejected Pruitt's claim that he presented previously undiscovered evidence at the PCR hearing showing that he is mentally retarded. We reviewed in detail the evidence of mental retardation presented at trial and at the PCR hearing and concluded that trial counsels' performance was not deficient in their investigation and presentation of mental retardation evidence. See supra Part III-B-1(a), B-1(b). We also addressed Pruitt's claims that he presented previously undiscovered evidence of mental retardation at the PCR hearing and found the evidence to be cumulative of evidence presented at trial. See supra Part X-A. Our review of the record and of the PC court's findings does not lead us to an opposite conclusion than that reached by the PC court. We agree with the PC court that "Pruitt has offered no evidence undermining the correctness" of the trial court's and this Court's findings that he is not mentally retarded. (App. to Br. of Pet.-Appellant 689.) Pruitt's death sentence is therefore not unconstitutional under Atkins.

## XII

Pruitt's final contention is that he was denied a fair PCR hearing because (1) his PCR judge was the same judge who presided over his trial and (2) this judge allegedly adopted all of the State's proposed findings of fact and conclusions of law in his post-conviction order. (See Br. of Pet.-Appellant at 80.) In this appeal, he requests a new PCR hearing. See id. at 86.

As to item (1), Pruitt filed a timely Motion for Change of Judge, supported by the "Affidavit of Tom R. Pruitt," which Judge Humphrey denied. (See App. to Br. of Pet. Appellant 81-90, 105-106.) Post-Conviction Rule 1(4)(b) provides that a petitioner's motion for change of judge "shall be granted if the historical facts recited in the affidavit [filed in support of the motion] support a rational inference of bias or prejudice." This rule "requires the judge to

---

"a finding of mental retardation requires a showing [by the defendant] of both significantly subaverage intelligence and significant limitations in adaptive functioning." Id. This Court determined that the trial court's finding that Pruitt failed to meet the "intelligence prong" was supported by the record and therefore concluded that the trial court's finding that Pruitt was not mentally retarded was not clearly erroneous. Id.

52

examine the affidavit, treat the historical facts recited in the affidavit as true, and determine whether these facts support a rational inference of bias or prejudice." Lambert, 743 N.E.2d at 728 (quoting State ex rel. Whitehead v. Madison County Cir. Ct., 626 N.E.2d 802, 803 (Ind. 1993)). "[A] change of judge is neither 'automatic' nor 'discretionary,' [but] calls for a legal determination by the trial court." Id. (quoting Sturgeon v. State, 719 N.E.2d 1173, 1181 (Ind. 1999)). It is presumed that the PC court is not biased against a party and disqualification is not required under the rule unless the judge holds a "personal bias or prejudice." Id. (quoting P–C.R. 1(4)(b)). Typically, "a bias is 'personal' if it stems from an extrajudicial source – meaning a source separate from the evidence and argument presented at the proceedings." Lambert, 743 N.E.2d at 728.

Here, Pruitt's appellate brief to this Court emphasizes three reasons from his affidavit that support his motion for change of judge: (1) his belief that Judge Humphrey would have an interest in defending his appointment and assessment of expert witness Dr. Schmedlen; (2) his belief that Judge Humphrey would have an interest in defending his finding that Pruitt was not an individual with mental retardation; and (3) his belief that Judge Humphrey would have an interest in defending his finding of no mitigating circumstances at the sentencing phase of trial. (See Br. of Pet.-Appellant at 81.) Our review of Pruitt's affidavit in support of his motion for change of judge shows no historical facts that demonstrate personal bias or prejudice on the part of Judge Humphrey. He merely cites Judge Humphrey's trial rulings against him, which are not indicia of personal bias.[49] We therefore affirm Judge Humphrey's denial of Pruitt's Motion for Change of Judge.

---

[49] Pruitt stated in his affidavit, "[b]ecause Judge Humphrey picked Dr. Schmedlen, and relied on him to find I was not mentally retarded, I believe Judge Humphrey will be biased against my PCR challenges to Dr. Schmedlen's work." (App. to Br. of Pet.-Appellant at 89.) He also stated, "Judge Humphrey decided I was not mentally retarded, and that I was instead 'malingering.' I believe this finding means Judge Humphrey is biased against me, because no expert said I was 'malingering.'" Id. Finally, he stated, "Judge Humphrey decided I did not have any 'mental condition' that could 'mitigate' my sentences. My lawyers say they will be presenting evidence of mental illness at my PCR. I believe Judge Humphrey will be biased against that evidence, because he has already decided I do not have any such problems." Id. at 89-90.

As to item (2), that Pruitt was prejudiced by Judge Humphrey allegedly adopting all of the State's proposed findings of fact and conclusions of law in his post-conviction order, we note that this Court has not prohibited this practice. We have commented in our past decisions that

> It is not uncommon for a trial court to enter findings that are verbatim reproductions of submissions by the prevailing party. The trial courts of this state are faced with an enormous volume of cases and few have the law clerks and other resources that would be available in a more perfect world to help craft more elegant trial court findings and legal reasoning. We recognize that the need to keep the docket moving is properly a high priority for our trial bench. For this reason, we do not prohibit the practice of adopting a party's proposed findings.

Saylor v. State, 765 N.E.2d 535, 565 (Ind. 2002) (quoting Prowell, 741 N.E.2d at 708-09).

Therefore, although "we do not encourage post-conviction court judges to adopt wholesale the findings and conclusions of either party, we decline to find bias solely on that basis." Saylor, 765 N.E.2d at 565. "The critical inquiry is whether the findings adopted by the court are clearly erroneous." Id. (citing Woods v. State, 701 N.E.2d 1208, 1210 (Ind. 1998) (accepting findings of fact unless they are clearly erroneous, although we give conclusions of law no deference)). Here, even though the PC court substantially adopted the State's proposed findings and conclusions, our thorough review of its order throughout this opinion shows that it is supported by the record. The PC court's findings and conclusions are therefore not clearly erroneous and Pruitt has shown no bias or prejudice in this respect.

We conclude that Pruitt was provided with a full and fair PCR hearing before an impartial judge, and therefore deny his request for a new PCR hearing.

## Conclusion

We affirm the PC court's denial of Pruitt's petition for post-conviction relief.

Shepard, C.J., and Dickson and Boehm, JJ., concur.

54

Rucker, J., dissents with separate opinion.

**Rucker, Justice, dissenting**

On direct appeal I was convinced that Pruitt was mentally retarded and thus not eligible for a death sentence. <u>See</u> <u>Pruitt v. State</u>, 834 N.E.2d 90, 123-26 (Ind. 2005) (Rucker, J., dissenting). After examining the evidence presented to the post-conviction court, I am even more convinced today. Pruitt's status has not changed. He was and still is mentally retarded. I would therefore reverse his death sentence and remand this cause with instructions to impose a term of years.